WINNIE DUDLEY, AS ADMINISTRATRIX OF THE GOODS, CHATTELS AND EFFECTS OF RAYMOND L. DUDLEY, DECEASED, AND AS ADMINISTRATRIX *AD PROSE-QUENDUM* OF RAYMOND L. DUDLEY, DECEASED, PLAINTIFF-APPELLANT, v. VICTOR LYNN LINES, INC., A CORPORATION, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 16, 1957—Decided January 20, 1958.

458

Before Judges CLAPP, JAYNE and SCHETTINO.

*Mr. Aaron Gordon* argued the cause for plaintiff-appellant (*Messrs. Hirschberg, Nashel, Zorn and Cronson,* attorneys).

*Mr. William R. Morrison* argued the cause for defendant-respondent (*Messrs. Morrison, Lloyd and Griggs,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J. A. D.  Plaintiff appeals from a judgment of involuntary dismissal granted by the Law Division upon the conclusion of plaintiff's case on the ground, apparently, that there was insufficient proof of negligence on the part of the defendant which proximately caused the plaintiff's decedent's death.  The motion on the alternative ground that the plaintiff's exclusive remedy was under the New Jersey Workmen's Compensation Act (*N. J. S. A.* 34:15-1 *et seq.*) was denied.  This is a tort action arising out of the alleged wrongful death of decedent, an employee of defendant and husband of plaintiff.

Plaintiff's decedent died in New York City on February 23, 1955 of a heart attack.  At the time, he was employed by defendant as a truck driver working out of its Kearny terminal.  Prior to his death Dudley had been in good health but had had a cold during the several days immediately preceding February 23 and during these few days Dudley sought no outside medical treatment, administering aspirin and hot tea to himself.

When Dudley arrived at work on February 23 he had brought to the attention of Mr. Funke, defendant's assistant warehouse manager, that he, Dudley, was suffering from a

cold and would prefer to stay in New Jersey. Dudley made
no complaint of any grievous illness or any claim that he
could not properly perform his ordinary work at that time.
His request to stay in New Jersey was not granted and
he was assigned to a New York delivery, a run of some
12 miles from defendant's terminal.

The trip was delayed as the result of traffic congestion
and Dudley and his truck did not arrive at the delivery
point until approximately 10:45 A. M. During the course
of the trip, Dudley told Ventura, his helper, that he was
not feeling well but he appeared to be all right to the helper.
Upon arriving at the delivery place, Dudley parked the truck,
went into the receiving office, where he remained for ap-
proximately 15 minutes, then came out of the warehouse,
re-entered the truck and, after driving around the block
twice before locating a space, parked his truck.

About 11:25 A. M. Dudley complained to Ventura that
he did not feel well, his arms were stiff, he was sweating
and his nose was running. He asked Ventura to call the
employer's terminal and tell defendant that he was sick.
The call to the terminal was put through by Ventura at
about 11:30 A. M., at which time the helper told Funke
that Dudley was sick and wanted a relief driver. In
reference to the conversation, the helper testified:

"I told him that he wasn't feeling good and he said as soon as
he could he would get somebody, he would send them over, and in
the meantime for him to sit in the cab and for me to take care
of everything, start unloading."

Ventura further testified that after he returned from making
the call, some five or ten minutes later, he saw Dudley
walking around the truck staggering as if he were drunk,
and that Dudley told him that he had never felt that way
before. Dudley then sat in the cab of the truck at which
time Ventura noticed that Dudley was sweating. Ventura
began to unload the truck.

Shortly thereafter at about 12:10 to 12:15 P. M. Dudley
asked Ventura to call plaintiff and to ask her to have her

brother come over to New York to pick him up. Mrs. Dudley told Ventura that she would try to reach her brother but that she was not certain that she could do so. Apparently unable to reach her brother, Mrs. Dudley called defendant's terminal and spoke to Funke at about 12:30 P. M. She testified:

"I told him I had a call from Ray's helper and that Ray was sick and that he wanted me to get my brother, and then I couldn't get my brother so Mr. Funke said he had heard that Ray was sick in New York but for me not to worry and he would get in touch and I call him back later."

Then at about 1:00 P. M. plaintiff again called Funke. She described the conversation as follows:

"He told me he got in touch with New York—I don't know with whom—and that Ray was feeling a little better and he would send help out and get a doctor and for me not to worry, there was a truck somewhere, I don't know, and for me to stay home in case there be another call and not to worry, that they get a doctor."

After lunch and from approximately 1:00 P. M. until sometime between 2:00 and 2:30 P. M. the helper was unloading the truck. During the period, on occasions, he was able to see Dudley in the cab. Sometime between 2:00 and 2:30 P. M. Ventura heard from a loud speaker that Dudley had just fallen from the cab. Someone called an ambulance and, when it arrived at approximately 2:30 P. M., Dudley was pronounced dead.

Nobody from defendant's terminal appeared until about 3:00 P. M., when a relief driver arrived. It was not until 4:30 P. M., when plaintiff again telephoned Funke, that she was told of her husband's death. Plaintiff's medical expert testified that decedent died from an acute coronary occlusion resulting in acute myocardial infarction; that additionally, in his opinion, the precipitating factor in Dudley's death was the lack of prompt medical assistance from the time the attack began to the time of his death.

Plaintiff brought this action under the provisions of the New York Decedent's Estate Law (*McKinney's Consolidated*

*Laws of New York, c.* 13, § 130) which is conceded by all involved to be similar to the pertinent provisions of our death act. (*N. J. S. A.* 2A:31-1 *et seq.*) The action was brought under that act on the premise, similarly conceded by everyone involved, that pertinent principles of choice of law make the substantive law of New York controlling and, in addition, that the New York act applies to any wrongful death occurring in New York regardless of where the tort occurred. Since no evidence of the common law of New York with respect to the duty owed by defendant in a case such as this was presented, the trial court must have assumed that the common law tort principles are the same in New York as they are in New Jersey. In view of this and the similarity of the death-action provision of the statutes we do not consider the question with respect to the choice of the applicable law and, incident thereto, where the tort, if any, occurred.

Liability is premised on two grounds: the so-called "Humane instincts doctrine" of *Szabo v. Pennsylvania R. R. Co.,* 132 *N. J. L.* 331 (*E. & A.* 1945), and the theory that where an employer undertakes to aid an injured employee he assumes a duty to exercise reasonable care in so doing. Before discussing the basic questions with respect to the applicability of these doctrines, two other issues are to be considered. These are (I) the jurisdictional question as to whether the workmen's compensation claim is the exclusive remedy, and (II) the evidentiary question as to whether conversations between Mrs. Dudley and Funke and between decedent's brother-in-law and Funke were admissible as binding upon the corporate defendant.

## I.

Although it is true that the Workmen's Compensation Act supersedes the common law redress in tort cases (see *U. S. Casualty Co. v. Hercules Powder Co.,* 4 *N. J.* 157 (1950); *Danek v. Hommer,* 9 *N. J.* 56 (1952)), yet it is an unwarranted application of this theory to hold the statu-

tory remedy exclusive where the proofs tend to show that the injury did not arise out of and in the course of employment which are the essential ingredients for an accident to be compensable. In *Estelle v. Board of Education of Red Bank,* 26 *N. J. Super.* 9 (*App. Div.* 1953), modified in 14 *N. J.* 256 (1954), this court stated at *page 26* of 26 *N. J. Super.*:

"Where there is a right to compensation under the statute, the remedy given by the statute is exclusive, and the employee can pursue no other remedy. *R. S.* 34:15–8. But on the other hand, the compensation legislation does not bar a common-law suit for an injury that does not come within the coverage provisions of the act. *Smith v. International, etc., Co.,* 98 *N. J. L.* 574 (*E. & A.* 1923); *Downing v. Oxweld, etc., Co.,* 112 *N. J. L.* 25 (*Sup. Ct.* 1933), affirmed 113 *N. J. L.* 399 (*E. & A.* 1934); and see 2 *Larson, Workmen's Compensation,* § 65.10."

The trial court appears to have been correct in determining that there was no remedy under the Workmen's Compensation Act. The doctrine of unusual strain has never been repudiated and we are bound to follow it. Thus, in compensation cases, there is a presumption that death from heart disease results from natural causes. *Aromando v. Rubin Bros. Drug Sales Co.,* 47 *N. J. Super.* 286, 292, (*App. Div.* 1957); *Kream v. Public Service Coord. Transport,* 24 *N. J.* 432, 436 (1957); *Neylon v. Ford Motor Company,* 8 *N. J.* 586 (1952); *Lohndorf v. Peper Bros. Paint Co.,* 134 *N. J. L.* 156 (*Sup. Ct.* 1946), affirmed 135 *N. J. L.* 352 (*E. & A.* 1947). Driving a heavy trailer truck in heavy traffic was certainly part of Dudley's everyday job. There clearly was no "unusual strain or exertion" or "unique experience" in the instant case. There is no evidence in the record as to any unusual physical stress or strain causing a myocardial infarction arising out of and beyond Dudley's mere employment.

## II.

Two days after the decedent's death Funke made certain statements to decedent's brother-in-law. These state-

ments were properly excluded by the trial court. It seems clear beyond peradventure that Funke, who was assistant terminal manager of the defendant's Kearny terminal, had no authority to bind defendant by virtue of any statements made by him to the decedent's brother-in-law two days after decedent's death for a purpose not even remotely related to Funke's functions as an assistant terminal manager.

█ Declarations of an agent are not receivable against his principal unless they are within the scope of his duties and delegated authority. *Hansen v. Eagle Picher Lead Co.,* 8 *N. J.* 133, 145 (1951); *Cafone v. Spiniello Const. Co.,* 42 *N. J. Super.* 590, 604 (*App. Div.* 1956); but *cf. Uniform Rules of Evidence, Rule* 63(a) 1953; 4 *Wigmore on Evidence,* (*3rd ed.* 1940), § 1078, *p.* 119, and 1957 *Supp.* The instant case is entirely unlike the *Cafone* case relied upon by plaintiff. In that case Spiniello in "his position as president and his actual knowledge of the company's conduct at the time certainly gave him apparent authority to represent his principal and to make declarations in its behalf in the public investigation" (42 *N. J. Super.* at *page* 605). The facts are not similar here.

█ But as to the February 23 telephone conversations between plaintiff and Funke, we find such statements to be admissible against defendant. In *Hollander v. Smith & Smith,* 10 *N. J. Super.* 82, 87–88 (*App. Div.* 1950), certification denied 6 *N. J.* 399 (1951) this court said:

"Statements of an agent are not evidence against his principal unless made in the course of the business entrusted to him. The statement, even of a general agent, although relating to the business of the principal, is inadmissible unless the statement itself is made in execution of the agency. *Barcello v. Biel,* 137 *N. J. L.* 606 (*E. & A.* 1948). But words spoken in pursuance of the duty of an agent, whether he be general or special, can be proved. *Arenson v. Skouras Theatres Corp.,* 131 *N. J. L.* 303 (*E. & A.* 1944). It is often said that such a statement is admissible only if the transaction to which it relates is pending at the time the statement is made. See 31 *C. J. S. Evidence* § 343. *Runk v. Ten Eyck,* 24 *N. J. L.* 756 (*E. & A.* 1853). But this view is not sound; it stems from a confusion of the rules relating to *res gestae* with those concerning admissions against interest. Or from the fact that generally a statement made by an agent after the close of the

transaction is outside the boundaries of his agency. See *Wigmore, Evidence*, § 1078. The report by the ambulance attendants to the general manager and their answers to his questions, were clearly given in the course of their duty and were evidence against the corporation."

Funke's duties encompassed the activities and control of decedent and other employees of defendant and these alleged statements were made within the scope of his duties and delegated authority and in execution of his agency.

## III.

Turning to the basic question whether there existed any duty on the part of defendant owing to Dudley, plaintiff relies on the "humane instincts doctrine" of the *Szabo* case, *supra* (132 *N. J. L.* 331). There the employee became "prostrated by the heat and became powerless to help and care for himself." The court stated the general rule that in the absence of contract or statute an employer owes no duty to provide medical service to, or to undertake any other curative means with respect to an ill, diseased or injured employee. However, after stating the general rule, the Court of Errors and Appeals developed the exception founded upon "humane instincts" at *page* 332 of 132 *N. J. L.*:

"* * * where one engaged in the work of his master receives injuries, whether or not due to the negligence of the master, *rendering him helpless to provide for his own care,* dictates of humanity, duty and fair dealing require that the master put in the reach of such stricken employee such medical care and other assistance as the emergency, thus created, may in reason require, so that the stricken employee may have his life saved or may avoid further bodily harm. *This duty arises out of strict necessity and urgent exigency. It arises with the emergency and expires with it.*" (Emphasis added)

*Cf. Burns v. Bakelite Corp.*, 17 *N. J. Super.* 441, 443 (*App. Div.* 1952); *Duda v. Gaines*, 12 *N. J. Super.* 326, 328 (*App. Div.* 1951); *Bascho v. Pennsylvania Railroad Co.*, 3 *N. J. Super.* 86, 92 (*App. Div.* 1949); *Hunicke v. Meramec*

*Quarry Co., 262 Mo. 560, 172 S. W. 43 (Sup. Ct. 1914); Wilke v. Chicago, Great Western Ry. Co., 190 Minn. 89, 251 N. W. 11 (Sup. Ct. 1933); Carey v. Davis, 190 Iowa 720, 180 N. W. 889, 12 A. L. R. 904 (Sup. Ct. 1921); Tippecanoe Loan & Trust Co. v. Cleveland, etc., Ry. Co., 57 Ind. App. 644, 104 N. E. 866 (App. Ct. 1914).* See also 56 *C. J. S. Master and Servant* §§ 161, 162, *p.* 814.

The above-emphasized language appears to leave little doubt that the motivating factor in establishing the duty described therein was the fact that the employee was in a helpless condition, "unable to provide for his own care." This requirement appears to be generally recognized as a prerequisite to the application of the doctrine. The court in *Hunicke v. Meramec Quarry Co., supra* [262 Mo. 560, 172 S. W. 50], pointed out that the employee must be so badly injured as to be "thereby rendered physically or mentally incapable of procuring medical assistance for himself," and in *Tippecanoe Loan & Trust Co. v. Cleveland, etc., Ry. Co., supra* [57 Ind. App. 644, 104 N. E. 868], the injuries must be of such a nature as to render him "incapable of caring for himself."

At this point we emphasize the principle that, notwithstanding doubts as to the adequacy and credibility of plaintiff's case, in ruling on a motion for dismissal at the end of plaintiff's case, the trial court is obliged to accept plaintiff's portrayal as evidenced by the most favorable testimony introduced on her behalf along with all favorable inferences which the jury might properly draw therefrom. See *O'Donnell v. Asplundh Tree Expert Co.,* 13 N. J. 319, 328 (1953), and *Nierman v. Casino Arena Attractions, Inc.,* 46 N. J. Super. 566, 569 (App. Div. 1957).

Plaintiff contends that Dudley was unable to take care of himself, that he did not have the capacity to think clearly during the attack and therefore Dudley fulfilled the *Szabo* case tests set forth above. But plaintiff's own witness testified that after the onset of the attack, Dudley entered the warehouse office at 17th Street, took some papers into the warehouse office, transacted his business there with refer-

ence to his delivery, returned to his truck, drove it around the block twice without apparent difficulty and after finding a space parked the truck; that at 11:20 A. M. he instructed Ventura to call defendant's terminal to have a replacement sent out for him, and at 12:10 P. M. told his helper to call plaintiff and have her send his brother-in-law out to pick him up. Even though we deduce the most favorable inferences for plaintiff from this record testimony, we hold that the attack did not render Dudley "helpless to provide for his own care." To the contrary, his instructions to his helper and his activities in the performance of his duties firmly indicate that Dudley was physically and mentally capable of procuring medical assistance for himself.

Additionally, the testimony on behalf of plaintiff does not establish a jury question on whether or not Dudley's condition was such that Funke knew or should have known that it presented an emergency requiring immediate medical attention. Unlike the facts in the *Szabo* case, *supra,* (132 *N. J. L.* 331, 334) and the *Burns* case, *supra* (17 *N. J. Super.* 441, 443), where defendant-employer's agent saw and had knowledge of the employee's condition, here, as stated above, Funke had been told that Dudley had been ill for several days before February 23, that Dudley had reported for work that morning with a cold, that Ventura told Funke that Dudley "wasn't feeling good," and that plaintiff told Funke that her husband "was sick." But other than these items of information no evidence presenting an emergency to the knowledge of defendant appears in this record.

We therefore find no basis for the application of the "humane instincts doctrine."

## IV.

The second theory advanced by plaintiff is that defendant, having voluntarily undertaken to aid the decedent, became duty bound to exercise reasonable care with respect thereto. *Bascho v. Pennsylvania R. R. Co., supra* (3 *N. J. Super.,* at *page 92*); *Burns v. Bakelite Corp., supra* (17 *N. J.*

*Super.,* at *page* 443) ; 46 *A. L. R.* 389; 56 *C. J. S. Master and Servant* § 164, *p.* 819; 38 *Am. Jur., Negligence, Voluntary Assumption of Duty,* § 17, *pp.* 659–660. As Judge Cardozo observed in the leading case of *Glanzer v. Shepard,* 233 *N. Y.* 236, 135 *N. E.* 275, 276, 23 *A. L. R.* 1425, 1427 (*Ct. App.* 1922) :

> "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."

In *Seavey, "Reliance upon Gratuitous Promises or Other Conduct,"* 64 *Harv. L. Rev.* 913, 919, we find further refinement of this principle :

> "Likewise, one who represents that he will extend aid to a helpless person is responsible for the harm caused by the failure to receive aid if, but for the defendant's conduct, aid would have been rendered by others. (citing cases)"

The application of the above principles in the instant case depends on the conversation which transpired between Funke and plaintiff at approximately 1:00 P. M. Mrs. Dudley testified that Funke told her :

> "\* \* \* that Ray was feeling a little better and *he would send help out and get a doctor and for me not to worry,* there was a truck somewhere, I don't know, *and for me to stay home in case there be another call and not to worry, that they get a doctor."* (Emphasis added)

Plaintiff argues that defendant thus assumed a duty to render medical assistance to decedent. No action was ever taken by defendant to supply medical aid to decedent. Efforts on behalf of defendant were limited to sending out a relief driver who failed to arrive on the scene until after decedent was pronounced dead.

We should keep in mind that causation in these cases is usually to be a matter for the jury. Perhaps the jury could properly infer that, but for Funke's representations to plaintiff, medical assistance would have been obtained

for Dudley by plaintiff or others. If Funke's assurance that he would get a doctor should be taken as an indication of his knowledge with respect to the seriousness of the decedent's condition (and we must consider such to be the posture of the proofs at this stage of the proceeding) the matter ought to have been submitted to the jury on the question of whether defendant acted reasonably after assuming a duty to render aid. In fact, apart from Funke's knowledge of the seriousness of the situation, could he not be held to a further duty of inquiry having once affirmed his intentions as a volunteer? In view of the speed with which the ambulance did arrive when summoned, a jury might conclude that the failure by Funke to seek emergency aid by calling a hospital or some other medical help, constituted negligence which proximately caused decedent's death. *Cf. Bascho v. Pennsylvania R. R. Co., supra,* (3 *N. J. Super.,* at *page* 92) ; *Restatement, Torts,* § 323 (1934) ; *Owl Drug Co. v. Crandall,* 52 *Ariz.* 322, 80 *P. 2d* 952 (*Sup. Ct.* 1938) ; *Seavey, "Reliance on Gratuitous Promises or Other Conduct,"* *supra.* It is clear that if such were the case, the negligence would be attributable to the defendant since it seems apparent that Funke as assistant terminal manager could, in an emergency, assume the responsibility on behalf of defendant to procure medical aid for a stricken employee.

In *Fontanella v. New York Central R. Co.,* 186 *App. Div.* 588, 174 *N. Y. S.* 537, 538 (*App. Div.* 1919), affirmed by the New York Court of Appeals, 228 *N. Y.* 546, 126 *N. E.* 907 (1920), the court stated:

"The jury has found, upon what the court must deem to be sufficient evidence, that the delay of approximately an hour at this emergency hospital [operated by the defendant railroad] permitted this infection so to develop that it became necessary, by reason thereof, to amputate the plaintiff's leg. This action is brought, not for the original accident, but for the injury arising from the neglect of the defendant to provide prompt emergency treatment. \* \* \*"

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

A corporation must always act through its agent, and public policy would seem to require that in the providing of prompt service, where prompt service may be vital to the welfare of the patients,

as well as in the providing of competent surgical and nursing attention, such an institution is under the duty of reasonable diligence. Such a duty is not one that can be delegated, but is one which rests primarily and always with the institution, and for the negligence of the assistant station master in failing to provide prompt emergency treatment in the case at bar we think the defendant was properly held responsible."

Plaintiff's medical expert's testimony emphasizes the *Fontanella* opinion's application to Dudley's death. The doctor stated:

"* * * the precipitating factor in causing his death from this acute coronary occlusion was the fact that once he had the onset of this acute coronary occlusion, * * * the fact that he did not obtain medical assistance and aid necessary * * * was the factor, in my opinion, that caused his death to occur certainly much sooner than it possibly could have otherwise and, in my opinion, it's reasonably probable that a man in this situation, if he had received medical attention, would have survived the type of attack that he did have."

At the end of plaintiff's case, we feel that the jury could have found from the testimony that defendant—although under no obligation to do so—had assumed gratuitously to act for Dudley's welfare; that defendant had represented to plaintiff that it would extend medical aid to Dudley, that but for such representation medical assistance would have been obtained for Dudley; that the defendant failed to perform its promise of obtaining medical assistance; that the failure to provide prompt medical assistance was the precipitating factor in Dudley's death, and therefore defendant's lack of performance was the negligence which proximately caused Dudley's death.

Reversed and new trial granted.