[No. 94-40208-1.  Division One.  April 20, 1970.]
Panel 1

IRENE M. SANDERS, *Appellant,* v. DEL DAY *et al., Respondents.*

*MacDonald, Hoague & Bayless, David R. Hood,* and *Stephen Feldman,* for appellant.

*Haugland, Sherrow & Williams* and *Robert C. Williams,* for respondents.

JAMES, C. J.—Del Day admits that he falsely said, while in the presence of several others, that he and Irene Sanders had engaged in an act of sexual impropriety. Sanders joined Day and Midnight Sun Broadcasting, Inc. as defendants, alleging that Day made the slanderous utterance as Midnight Sun's agent. Midnight Sun denied that Day made the remark as its agent and moved for judgment summarily dismissing it from the suit. The motion was granted, and Sanders appeals.

■ Midnight Sun has thus assumed the burden of establishing that there is no genuine issue as to any material fact, and that the undisputed facts do not permit application of the doctrine of respondeat superior. *Balise v. Underwood*, 62 Wn.2d 195, 381 P.2d 966 (1963). While Sanders concedes that there is no substantial dispute as to the evidentiary facts, she asserts that the inferences to be drawn from them are in sharp dispute. Sanders contends that the ultimate and critical question of fact—whether Day acted within the scope and course of his employment—is necessarily inferential.

Sanders is a secretary in a Seattle advertising agency. Day is president of Del Day, Inc., an advertising "media representative".[1] Sanders did not name Del Day, Inc. as a defendant in this action. Midnight Sun, an Alaska corporation, operates radio and television stations in Alaska.

Day had first been employed by Midnight Sun in 1948 as an announcer. He later became a station manager in Juneau and remained a full-time salaried employee upon being transferred to Seattle in 1952 to serve as Midnight Sun's western national sales manager. At that time Midnight Sun maintained a Seattle office.

By 1964, however, Day was no longer a salaried employee of Midnight Sun. Del Day's corporation, Del Day, Inc., had become Midnight Sun's media representative for the western United States. The relationship between Midnight Sun and Del Day, Inc. was governed by a written contract. Del Day, Inc. agreed that it would have no dealings with any current or potential competitor of Midnight Sun. Del Day, Inc. had two other principal clients as a media representative, but about 50 per cent of its gross income was derived through its contract with Midnight Sun.

Del Day the individual, however, retained a direct relationship with Midnight Sun. He was the corporate vice-president of Midnight Sun. His business card identified him

[1] The parties agree that a "media representative" is one who sells radio and television stations' air time to advertising agencies or to advertisers directly.

only as vice-president of Midnight Sun Broadcasting Company. The stationery Day used in the regular course of his business identified him as vice-president of Midnight Sun Broadcasting Company and carried no other identification. He was listed in the television industry's publication of standard rates as vice-president of Midnight Sun. Day, the vice-president, conducted local job interviews on behalf of Midnight Sun and entertained its visiting dignitaries from Alaska. He also compiled and published Midnight Sun's national rate schedules.

Sanders and Day, as members of the advertising profession, participated in a tournament of the Advertising Golf Association of Washington. Membership in the association is limited to individuals in the communications industry.

Day had entertained friends at an all-night party at his home on the evening before the golf tournament and had had much to drink. He had planned to play golf in the tournament the next day, but when one of his golf partners contacted him that morning, Day attempted to beg off because of his previous night's overindulgence. His friends finally persuaded him, because he was to be part of a foursome, to keep his commitment.

After finishing his round of golf with the aid of a thermos jug of "Bloody Marys", Day was told that someone from Midnight Sun had been trying to reach him. He telephoned and ascertained that an emergency existed because of the absence of certain color film promised by a Seattle advertising agency. He made several telephone calls to straighten out the problem. Between these calls Day had several drinks with Sanders and told her of the film mixup. Day's companions, to whom he later made the slanderous statement, saw Sanders and Day together.

It was after the golf tournament had been completed, after the film mixup had been resolved, after Day's conversation with Sanders, and while playing the "19th hole," that Day made the unfortunate remark.

Everyone who heard him agrees that Day said nothing at the time to indicate that he was acting for or furthering the

business of Midnight Sun in any way. An affidavit of an officer of Midnight Sun states that obviously Day's offensive remark was not authorized by the corporation. Midnight Sun contends that under the established facts Day's authority as a vice-president was limited to (1) conducting job interviews with prospective employees, (2) entertaining visiting dignitaries from Alaska, and (3) publishing Midnight Sun's national rate schedules.

But Sanders contends that she should have an opportunity to argue to the trier of fact that Day's motive in defaming her character was a misguided desire to ingratiate himself, the corporate vice-president, with potential customers of Midnight Sun. She argues that she should have an opportunity to examine Day and other officers of Midnight Sun in the presence of the trier of fact to establish that Day's slanderous utterance should not have come as any surprise—that his public relations personality was that of the hail fellow with a ready anecdote or ribald story.

In support of her contention that the trier of fact could find that Day made the slanderous utterance as an agent of Midnight Sun, Sanders offered the affidavit of a general manager in charge of radio time sales for a Seattle radio station. Among other things, he said,

> In my earlier affidavit I stated that I was not a member of the Advertising Golf Association. This is true. I am, however, on the waiting list to join this organization and am anxious to do so. I have on occasion attended functions of this organization, and I am fully aware of the importance it has to my business. It is at the functions of this organization that I am able to mingle, converse and contact the people with whom I deal for a livelihood. I consider these functions an asset to my job, and I attend them in my business and representative capacity. In my mind, playing golf at the AGA would be considered part of my job, and in the furtherance of my business.
>
> *I would consider myself a source of potential customers for Midnight Sun Broadcasting Company, Inc. The reason I say this is that without a doubt, if someone asked me who to see regarding getting on the air in Alaska, I would refer them to Del Day because I know*

*and have known that he is a representative of Midnight Sun and a Vice-President of that organization, and because he is a friend of mine.*

(Italics ours.)

■ Employers may be liable for their employees' unauthorized slanderous statements made within the *apparent* scope and course of employment.

> *Servant acting within apparent scope of employment.* If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes. The master may be liable even though the servant knows the statement to be untrue, . . . [D]efamation is effective, in part at least, because of the personality of the one publishing it. Thus, one who appears to have authority to make statements for the employer gives to his statements the weight of the employer's reputation. For this reason, the liability of the master may be based upon apparent authority.

Restatement (Second) of Agency § 247, comment c (1958). See also *Ecuyer v. New York Life Ins. Co.,* 107 Wash. 411, 181 P. 871, 186 P. 327 (1919).

■ Sanders is clearly correct in her assertion that the ultimate and critical question—whether Day acted within the scope and course of his employment—is necessarily inferential. The essential considerations in drawing the ultimate inference are stated in Restatement (Second) of Agency § 228 (1958) to be as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform; ·
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, . . .
>
> . . .
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that author-

ized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Some of the considerations for determining whether conduct is within the scope of employment are stated in Restatement (Second) of Agency § 229 (1958):

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

. . .

(i) the extent of departure from the normal method of accomplishing an authorized result; . . .

We will not replough or further cultivate the "field of summary judgment," as that task has been ably accomplished in *Balise v. Underwood*, 62 Wn.2d 195, 381 P.2d 966 (1963). When the facts here established are measured by the eight rules enunciated in *Balise*, it is clear that Midnight Sun has not met its burden of establishing that there is no genuine issue concerning the ultimate question of fact: Was Day acting within the scope and course of his employment?

█ Summary judgment procedures are not designed to resolve inferential disputes.

It seems obvious that in situations where, though evidentiary facts are not in dispute, different inferences may be drawn therefrom as to ultimate facts such as

intent, knowledge, good faith, negligence, et cetera, a summary judgment would not be warranted.

*Preston v. Duncan,* 55 Wn.2d 678, 681, 349 P.2d 605 (1960).

Expressing no opinion as to the merits, we hold that Sanders is entitled to have the inferences drawn by the trier of fact. At trial, of course, the burden of persuasion will be hers.

The order granting Midnight Sun's motion for summary judgment is reversed and the case remanded for trial. Costs on this appeal will abide final disposition of the case as between Sanders and Midnight Sun.

FARRIS and SWANSON, JJ., concur.

---

Petition for rehearing denied June 3, 1970.