[No. 43054.   En Banc.   January 9, 1975.]

JOHN F. BROWN, JR., *et al, Appellants*, v. MACPHERSON'S, INC., *et al, Appellants*, THE STATE OF WASHINGTON, *Respondent.*

*Hall Baetz,* for appellants Brown.

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow,* by *Robert P. Piper, Krutch, Lindell, Donnelly, Dempcy & Lageschulte,* by *Richard F. Krutch* and *Jerome R. Cronk,* and *Olwell, Boyle & Hattrup,* by *Lee Olwell,* for appellants MacPherson's, Inc., et al.

*Slade Gorton, Attorney General,* and *Angelo R. Petruss, Assistant,* for respondent.

WRIGHT, J.—This is an appeal by plaintiffs Dean, Stoen, Lunde and Edgers from an order of dismissal entered under CR 12(b). The State of Washington was dismissed as a defendant in the actions instituted by said plaintiffs. Our sole consideration in this appeal is whether the complaints of the named plaintiffs failed "to state a claim upon which relief can be granted" as against the State of Washington.

■ The facts as affect this appeal can be stated briefly. This being a dismissal under CR 12(b) the only matters considered are those stated in the complaints of the appellant-plaintiffs as amended by answers to interrogatories. It should be noted the trial court specifically refused to consider the motions as applications for summary judgment under CR 56.

In the early morning hours of January 24, 1971, an avalanche thundered down the slopes of the Cascade Mountains near the Stevens Pass Highway leaving death and destruction in the Yodelin development. There were avalanches later; one January 26, 1971, and another nearly a year later on January 19, 1972. We are concerned only with the tragic events of January 24, 1971.

On December 11, 1968, the Real Estate Division of the Department of Motor Vehicles was warned of danger at the Yodelin development by one Dr. Edward LaChapelle, a professor on the faculty of the University of Washington and a recognized expert in matters relating to avalanches.

The allegations in the Edgers' complaint as against the State of Washington are substantially representative of the allegations in all of the complaints of those plaintiffs who are appellants herein. Such allegations are as follows:

8. *Involvement of State of Washington.*
The State of Washington was specifically warned of the extreme hazard of avalanche danger at the Yodelin development and, although it communicated such warning to Defendants MacPherson's, William MacPherson, Nason Properties and Wendell Carlson, it failed to give any such warning to the general public or the known owners and occupants of the Yodelin property and specifically, failed to give such warning to the Edgers who the State knew or should have known from the information imparted to it to be in extreme danger of loss of their lives and property.

TR. 22
We shall refrain from extending this discussion beyond

that which is necessary to decide the matter now before the court. These consolidated cases will be tried and another appeal could quite possibly follow. We are, therefore, faced with somewhat the same situation which confronted this court in *Hofto v. Blumer*, 74 Wn.2d 321, 444 P.2d 657 (1968) when the court said at page 327:

We think it would be improper for us to discuss at this time the merits of the contentions of the parties which are fully stated in the briefs. To do so might have the effect of prejudging this case when it comes on for trial. As yet respondents have not had occasion to file an answer so that the factual issues have not been framed at this time.

The only department or agency of the State of Washington involved herein is the Real Estate Division of the Department of Motor Vehicles. The powers and duties of that division are set forth in RCW 18.85. The act in force at the time herein relevant was passed in 1951 with amendments and additions in 1953.

The Land Development Act of 1973, RCW 58.19, was not passed until 1973 and has no application to this litigation. It was adopted as chapter 12, Laws of 1973, 1st Ex. Sess. Many of the provisions of that act were clearly inspired by the tragedies which gave rise to these cases.

Further, an examination of RCW 18.85.040, which gives the powers and duties to the director of the Department of Motor Vehicles over the real estate licensees, will show he had absolutely no authority to do the acts which appellants contend he should have done. The only other source of authority in the real estate division is the real estate commission, which by RCW 18.85.085 and RCW 18.85.090 is given power to set up educational conferences, act in an advisory capacity and give examinations for applicants for licenses as salesmen or brokers.

The real estate division, lacking the power to do those things which are in question here, can not be liable for a failure to do same. The order of dismissal of the State of

Washington in those cases wherein the appellants were plaintiffs is, therefore, affirmed.

HALE, C.J., and ROSELLINI and HUNTER, JJ., concur. STAFFORD, J., concurs in the result.

UTTER, J. (dissenting)—The trial court's grant of the State's motion to dismiss under CR 12(b)(6) can be affirmed only if "it is clear beyond doubt from a reading of the complaint that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Higgins v. State,* 70 Wn.2d 323, 325, 422 P.2d 836 (1967). The majority concludes plaintiffs could not support a claim against the State because they cannot show that its agents had the power to avert this tragedy. I do not agree. There are two theories of liability in plaintiffs' complaints under which State officers could be shown to have had the power to prevent plaintiffs' injuries and to have exercised that power negligently. I would therefore reverse.

Plaintiffs' allegations against the State consist not only of those in the portion of their complaints quoted by the majority, but also of general averments that their damages were "proximately caused by the concealment, misrepresentations, breach of warranty and/or negligence" of the State and the several other defendants. These contentions are supplemented by answers to an interrogatory put by the State incorporated into the complaints by amendment which read substantially as follows:

THE STATE OF WASHINGTON,
1. WHILE IT and its officials and agents:
   a. Had specific knowledge of facts and circumstances showing that an extreme avalanche hazard existed in the area of the Edgers cabin at Yodelin, that winter time inhabitants thereof were in imminent danger and while its officials held the actual belief that such hazard existed
   b. Had the authority, power and duty to intervene, give or require warnings, and prevent a disaster
   c. Had given assurances to others that it would intervene which were relied upon
   d. And while the Edgers and others similarly situated

were justifiably complacent in the common belief that the State would not permit such a real estate development in a hazardous area

2. IT FAILED TO:

a. Give any warning thereof or to divulge any of the information it had regarding the danger to any of the Edgers household or to any other owners or inhabitants of the Yodelin Development

b. Require the realtor, MacPhersons, Inc., or the developer, Nason Properties, Inc., to warn the Edgers or other owners' or inhabitants of Yodelin

c. Suspend, revoke or deny the license of Mac-Phersons, Inc., or to take other appropriate and authorized legal action against the realtor and/or developer

d. Complete its investigation of the avalanche hazard in a proper manner or to require adequate avalanche information from MacPhersons or Nason Properties

e. Adequately communicate with MacPhersons and Nason Properties and led them to believe that it had confidential information from which it was satisfied no avalanche hazard existed—an impression upon which they relied to the ultimate detriment of the Edgers

Plaintiffs have further elaborated upon their allegations in argument here and in the court below by putting forth a statement of "hypothetical facts" which they contend would entitle them to relief if proven under their complaints. These "facts" are of course not technically before the court as no matter outside the pleadings may be considered on a motion for dismissal under CR 12(b)(6). *Stevens v. Murphy*, 69 Wn.2d 939, 421 P.2d 668 (1966). But the test on a CR 12(b)(6) motion is whether plaintiffs could prove *any* state of facts which would entitle them to relief. Since these "hypothetical facts" are not patently false and could be proven within allegations well pleaded, they may be considered as a set of facts on which plaintiffs might prevail in determining whether they can survive defendant's dismissal motion. *Cf. Callaway v. Hamilton Nat'l Bank*, 195 F.2d 556 (D.C. Cir. 1952).[1]

---

[1]Proper consideration of "hypothetical facts" does not deemphasize the distinction between motions under CR 12(b)(6) and summary

Plaintiffs' "hypothetical" factual allegations portray a sequence of events beginning with the notification of the avalanche danger given the real estate division by Dr. Edward LaChapelle, mentioned by the majority. They claim that, after this notification, one Mr. Tonnon, an agent of the division, told Dr. LaChapelle that the problem was being taken care of, and that in reliance on this Dr. LaChapelle refrained from himself warning plaintiffs. Plaintiffs further allege that Mr. Tonnon later met to discuss the matter with Mr. MacPherson, plaintiffs' realtor, and gave him the false impression that no danger existed, causing his company to take no further action to protect plaintiffs. Finally, they contend, Mr. Tonnon and other State officials terminated their investigation of the situation without directly or indirectly informing plaintiffs of the likelihood of an avalanche, and as a result plaintiffs were ignorant of the danger and therefore unable to avoid the losses they suffered when it was tragically realized.

The State does not claim sovereign immunity from this suit, and admits that it is liable "to the same extent as if it were a private person or corporation." RCW 4.92.090; *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 407 P.2d 440 (1965). Were plaintiffs' allegations made and proved against a private corporation, they would be entitled to relief under either of two common-law tort theories.

First, in their general allegations of negligence and in

judgment motions under CR 56. A summary judgment motion calls upon the court to determine from the pleadings and supporting documents whether any genuine issue of material fact exists requiring a trial. *Morris v. McNicol*, 83 Wn.2d 491, 519 P.2d 7 (1974). A CR 12(b)(6) motion questions only the legal sufficiency of the allegations in a pleading. But since this legal determination cannot always be made in a vacuum, it may be necessary to postulate factual situations which might form the basis for the pleading. No reason appears why one such hypothetical situation should not be that which the complaining party contends actually exists. The court need not find that any support for the alleged "facts" exists or would be admissible at trial, as it should on a summary judgment motion. The question under a CR 12(b)(6) motion is basically a legal one, and the "facts" are considered only as a conceptual backdrop for the legal determination.

paragraphs 1(a) and (c) and 2(e) of the answers to inter-
rogatory, plaintiffs have stated a claim against the State for
*misfeasance*. In those portions of their pleadings plaintiffs
allege essentially that Mr. Tonnon, the State's agent, under-
took to prevent the avalanche damage, in effect to rescue
plaintiffs from their danger, but in the process of attempt-
ing to do so negligently misled Mr. MacPherson and there-
by made plaintiffs' situation worse.

One who undertakes, albeit gratuitously, to render aid to
or warn a person in danger is required by our law to
exercise reasonable care in his efforts, however commenda-
ble. *Jay v. Walla Walla College*, 53 Wn.2d 590, 595, 335 P.2d
458 (1959); *French v. Chase*, 48 Wn.2d 825, 830, 297 P.2d
235 (1956). If a rescuer fails to exercise such care and
consequently increases the risk of harm to those he is
trying to assist, he is liable for any physical damages he
causes. *Spaulding v. United States*, 455 F.2d 222 (9th Cir.
1972); *Hill v. United States Fid. & Guar. Co.*, 428 F.2d 112
(5th Cir. 1970); *United States v. Gavagan*, 280 F.2d 319
(5th Cir. 1960); *Owl Drug Co. v. Crandall*, 52 Ariz. 322, 80
P.2d 952, 120 A.L.R. 1521 (1938); *Zelenko v. Gimbel Bros.,
Inc.*, 158 Misc. 904, 287 N.Y.S. 134 (1935), *aff'd*, 247 App.
Div. 867, 287 N.Y.S. 136 (1936); *Sheridan v. Aetna Cas. &
Sur. Co.*, 3 Wn.2d 423, 437-39, 100 P.2d 1024 (1940); Re-
statement (Second) of Torts § 323(a) (1965); W. Prosser,
*Torts* § 56 (4th ed. 1971).

Plaintiffs' second theory of the State's liability, contained
in paragraph 8 of the original complaint (quoted in the
majority opinion) and paragraphs 1 and 2(a) of the an-
swers to interrogatory, is based on *nonfeasance*. Their
claim is that Dr. LaChapelle refrained from warning plain-
tiffs of the avalanche danger in reliance on Mr. Tonnon's
representation that State officials would take care of the
matter, and that the State failed to perform this assumed
duty. Proof of these allegations would also entitle plaintiffs
to relief.

The common law of torts has long distinguished between

"acts" and "omissions," refusing to impose liability for the latter, even though the line between the two is far from easy to draw. W. Prosser, *Torts* § 56, at 339-40 (4th ed. 1971). Where a person gratuitously promised to perform a service for another in need and failed to fulfill his promise, ancient law refused to hold him to account. *See Thorne v. Deas*, 14 N.Y. (4 Johns.) 84 (1809). But this harsh rule has been eroded along several lines, the most prominent of which involves promises which induce reliance on the part of the promisee, causing him to refrain from seeking help elsewhere and thereby worsening his situation. This court recognized that inaction may create liability in such circumstances in *Sheridan v. Aetna Cas. & Sur. Co., supra.* There the defendant insurance company voluntarily undertook to inspect a hotel elevator and make periodic reports to the city on its safety; the hotel owners relied on the defendant and did not themselves make inspections. The reports were not made as required by ordinance and the elevator malfunctioned, injuring the plaintiff. The ordinance requiring the reports was held admissible to establish the extent of the assumed duty, and the omission in making them was therefore held to be a basis for the plaintiff's cause of action. *Sheridan v. Aetna Cas. & Sur. Co., supra* at 440.

Although we have not since directly addressed the question of tortious omissions, other courts have continued to extend the duty to act imposed by reliance on a gratuitous promise. Even where an offer to seek or render aid is implicit and unspoken, a duty to make good on the promise has been found by most courts if it is reasonably relied upon. *Stanturf v. Sipes*, 447 S.W.2d 558 (Mo. 1969); *Wilmington Gen. Hosp. v. Manlove*, 54 Del. 15, 174 A.2d 135 (1961); *Abresch v. Northwestern Bell Tel. Co.*, 246 Minn. 408, 75 N.W.2d 206 (1956). In other cases a duty to act has been found to have been created by reliance not by the person to whom the aid is to be rendered, but by another who, as a result of the promise, refrains from acting on that

person's behalf. In *Dudley v. Victor Lynn Lines, Inc.*, 48 N.J. Super. 457, 138 A.2d 53 (1958), *rev'd on other grounds*, 32 N.J. 479, 161 A.2d 479 (1960), plaintiff's wife remained with plaintiff, who was ill, relying on the defendant's offer to seek medical help. Defendant broke his word and no help came; he was held liable for plaintiff's resultant death. *United States v. Gavagan, supra*, involved a promise by a Coast Guard officer to save a sinking boat. Because other boats might have rescued its crew had their owners not relied on this promise, the court decided that the government was liable to the estates of the men who drowned when the Coast Guard failed to act. In *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956), a military officer told plaintiff's bodyguards he would warn them before a mental patient who had threatened her life was discharged from an Air Force hospital. The patient was released without the notification being given and killed the plaintiff; the government was held liable for the breach of its agent's promise. *See also Donald v. Garry*, 19 Cal. App. 3d 769, 97 Cal. Rptr. 191 (2d Dist. Ct. App. 1971); Restatement (Second) of Torts § 324A.(c) (1965); W. Prosser, *Torts* § 56 at 347 (4th ed. 1971).

The majority does not argue that either of these tort theories is not valid or not applicable. Rather, it relies simply on the proposition that the State officers whom appellants allege were negligent "had absolutely no authority to do the acts which appellants contend he should have done." It is not clear what the majority contends the legal significance of this supposed disability is. Clearly the language of the statutes creating the real estate division cannot change what the State's agents did or did not do, or what happened to the plaintiffs. There are two ways in which I can conceive the scope of statutory authority might be relevant; but in neither do I find it determinative.

The majority's position may rest on the proposition that, because the State officers involved here were not authorized to confer with Mr. MacPherson or communicate with

plaintiffs, any negligence in doing the former or failing to do the latter cannot be attributed to the State. But such a holding would be untenable under established principles of agency law. In communicating with Dr. LaChapelle and Mr. MacPherson, Mr. Tonnon was performing the kind of function the State employed him to perform, was apparently actuated by a desire to serve the State in his official capacity, and was acting within the time and space limits of his job. In such circumstances his status as the State's agent is clear. *Sanders v. Day*, 2 Wn. App. 393, 397, 468 P.2d 452 (1970); Restatement (Second) of Agency § 228(1) (1957). His power to consult with these interested individuals was implicit in and incidental to his duties to the State. *Cf. Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 833, 420 P.2d 698 (1966); *State ex rel. Van Orsdel v. Yelle*, 15 Wn.2d 320, 323, 130 P.2d 889 (1942). More important, he had apparent authority to do what he did, and where there is apparent authority even specific *prohibition* by the principal will not prevent agency from being established. *Greene v. St. Paul-Mercury Indem. Co.*, 51 Wn.2d 569, 320 P.2d 311 (1958).

The allegedly negligent inaction of the real estate division in failing to warn plaintiffs is similarly attributable to the State. Inaction may be conduct within the scope of an agent's employment. Restatement (Second) of Agency § 232 (1957). Where an agent creates a duty to act in the course of his employment, his failure to fulfill that duty is plainly attributable to his master. *Netherlands Am. Mortgage Bank v. Eastern Ry. & Lumber Co.*, 148 Wash. 249, 268 P. 604 (1928); *Southern Bell Tel. & Tel. Co. v. Yates*, 34 Tenn. App. 98, 232 S.W.2d 796 (1950); Restatement (Second) of Agency § 232, comment *d* (1957). If the majority's position is predicated on a finding of nonagency, therefore, it either departs substantially from prior law or creates a special exception to that law for the State which is inconsistent with the statutory waiver of sovereign immunity.

Alternatively, the majority's rationale may be one of tort law, rather than agency law, holding that the State cannot be held liable for failure to take actions it could not take. This theory could not have any application to plaintiffs' misfeasance theory, as the issue there is what the State's agents did, not what they failed to do. Nor, I believe, can it defeat plaintiffs' claim for nonfeasance. Neither the State nor a private individual should be held liable for failing to do the impossible, but it has not been shown that it would have been impossible to warn plaintiffs of the avalanche danger.

By statute, the real estate division is empowered to investigate the actions of real estate brokers (RCW 18.85.230) and make the findings of its investigations available to the public. (RCW 34.04.020.) These powers implicitly include the power to communicate with interested and affected persons in the course or at the end of such investigations. Further, decisionmaking officials have the power, to some extent, to define their own duties; plaintiffs allege, in effect, that Mr. Tonnon, by his representations to Dr. LaChapelle, construed his authority to include the ability to communicate with them. In any event, public officials have inherent power to communicate with the public regarding the State's business. *Gold Seal Chinchillas, Inc. v. State, supra* at 833.

There is some indication in the record of concern that informing plaintiffs of the avalanche danger might have subjected the State to liability for slandering the property developers. Such fears, if held, were completely unwarranted. Aside from the fact that no liability could ensue from a truthful publication (*Ecuyer v. New York Life Ins. Co.*, 101 Wash. 247, 172 P. 359 (1918)), a warning to plaintiffs would have at least been covered by the qualified privilege given communications prompted by a duty to the public or another. *Fahey v. Shafer*, 98 Wash. 517, 167 P. 1118 (1917). In addition, the absolute privilege of State officers to make public statements regarding their duties

28

(*Gold Seal Chinchillas, Inc. v. State, supra* at 834), and the qualified constitutional privilege given comment on matters of public interest (*Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971)), could, perhaps, have protected such warnings.

Thus, the State's agents were *legally* able to fulfill any promise to act to save plaintiffs' lives and property. Much more important, however, is the fact that the State's agents were *physically* able to warn plaintiffs of their peril. The real estate division undoubtedly had telephones and type-writers. This was power enough for its agents to communicate with plaintiffs regarding the avalanche danger if they had promised to do so. I do not believe the law requires a State officer to have special permission before he can follow the dictates of both common law and common sense.

In *Fair v. United States,* supra, the government argued that it could not be liable because its agent had no authority to warn the plaintiff that the person who had threatened her life was at large. The court held that the powers of government officers are not so limited, that they can take actions of which any private citizen is capable and can obligate themselves to do so, and that if such an obligation is made in the course of their employment the government is accountable for it. *Fair v. United States, supra* at 296. The court refused to accept the proposition that, by virtue of either the doctrine of sovereign immunity or a scheme of regulations which specifically delineated its employees' powers, the government could escape liability for the awful consequences of its agent's breach of the moral and legal duty to keep his word. I would not accept it here. I dissent.

FINLEY, HAMILTON, and BRACHTENBACH, JJ., concur with UTTER, J.

Petition for rehearing granted April 1, 1975.