17 P.3d 1189 (2000)
104 Wash.App. 328
Deborah K. KELLEY, Appellant,
v.
STATE of Washington, Department of Corrections, Respondent.
No. 25254-6-II.
Court of Appeals of Washington, Division 2.
December 8, 2000.
Publication Ordered February 1, 2001.
*1190 Sidney Stillerman Royer and Mark Leemon, Schroeter Goldmark & Bender, Seattle, for Appellant.
Glen Andrew Anderson, Assistant Attorney General, Olympia, for Respondent.
ARMSTRONG, C.J.
Kevin Ingalls assaulted Deborah Kelley while he was on community custody status. Kelley sued the Department of Corrections (DOC), claiming that Ingalls' community corrections officer (CCO), Dale Dewey, negligently supervised Ingalls. By statute, DOC is liable only for conduct that amounts to gross negligence. Dewey failed to discover that Ingalls had violated his curfew when police found him in a motel room one night and had possibly violated his curfew another night. Dewey also failed to make all of the required field contacts with Ingalls. The trial court dismissed Kelley's claim on summary judgment, and she now appeals. We find the evidence insufficient to establish gross negligence; accordingly, we affirm.

*1191 FACTS
Kevin Ingalls was sentenced to 43 months in confinement and one year of community custody[1] after he pleaded guilty to attempted rape. Although DOC requested it, the trial court did not order that Ingalls refrain from consuming alcohol. Nor did the trial court order that Ingalls' community placement would be terminated if he committed a crime. DOC also placed its standard community placement conditions on Ingalls. None are relevant here except the curfew that required Dewey to be home between 11:00 P.M. and 7:00 A.M . While in community custody, Ingalls lived in Copalis, Washington, with his mother and stepfather. CCO Dale Dewey supervised Ingalls.
Ingalls had two encounters with police while in community custody. The first occurred while he was visiting his father in south Seattle in April 1992. Ingalls had permission to go to Seattle on April 20 and to return home on April 24. But at 10:14 P.M. on April 24, 1992, police detained Ingalls outside a junior high school in Bothell. Ingalls said he was waiting to pick up his nephew from a dance. The police found a beer in the back seat of his car. CCO Dewey discussed the incident with Ingalls when Ingalls returned to Copalis. Dewey received a police report but concluded that he could take no action because Ingalls' community placement conditions did not prohibit the use of alcohol.
The second incident occurred in May 1992 in Ocean Shores, Washington. On May 31, 1992, police in Ocean Shores arrested Ingalls for entering an occupied motel room. After he was taken into custody, Ingalls attempted to escape from the police car. Ingalls' stepfather reported the arrest to Dewey, who then called the Ocean Shores police and learned, among other things, that Ingalls had been arrested in the motel room on "Sunday morning."
Dewey contacted DOC hearings officer, James Riker, and asked whether Ingalls had violated his community custody status. Riker said he had not. Dewey concluded that he "could not legally take any action against Ingalls" because, to his knowledge, Ingalls had not violated the conditions of his community custody status. The police agreed to send Dewey a copy of their report. At his deposition, Dewey could not remember whether he ever received the report. The report gave the time of arrest at the motel as 12:50 A.M.thus, Ingalls violated his curfew. Dewey also testified that he would have arrested Ingalls for the incident if he could have. Ingalls ultimately pleaded guilty to criminal trespass for the motel incident.
While in community custody, Ingalls regularly submitted bimonthly reports to Dewey and met with him twice a month at Dewey's office. But Dewey failed to make four face-to-face field contacts per month with Ingalls, as required. Instead, he made only 14 out of at least 27 required field contacts in eight months of supervision.[2]
On June 27, 1992, Deborah Kelley was walking along a road near Ocean Shores. When Ingalls stopped and offered her a ride, she accepted. Ingalls then purchased a six-pack of beer, which they began to drink. Ingalls drove down a side road, stopped the car, and demanded that Kelley have sex with him. Kelley refused and tried to leave, but Ingalls followed her and struck her with the truck. Ingalls got out, hit her with a board, and again demanded sex. Kelley ran and hid in nearby bushes, and Ingalls left the scene. Ingalls pleaded guilty to second degree assault for the incident.
In response to the State's motion for summary judgment, Kelley submitted the declaration of William Stough, a consultant in the corrections field. Stough opined that CCO Dewey was negligent in his supervision *1192 of Ingalls. Stough cites, among other things, Dewey's failure to (1) monitor and enforce Ingalls' curfew, (2) adequately investigate the Bothell incident, (3) initiate a disciplinary hearing after the Ocean Shores motel incident, (4) make required field contacts with Ingalls, (5) maintain adequate records, and (6) monitor drug use. The trial court granted the State's motion for summary judgment.

ANALYSIS
We review a summary judgment de novo. Hertog v. City of Seattle, 138 Wash.2d 265, 275, 979 P.2d 400 (1999). Summary judgment is proper if no genuine issues of material fact exist when viewing the facts in the light most favorable to the nonmoving party. Hertog, 138 Wash.2d at 275, 979 P.2d 400. The elements of negligence are (1) a duty to the plaintiff, (2) breach of that duty, and (3) resulting injury. Hertog, 138 Wash.2d at 275, 979 P.2d 400.
The issues here are (1) the nature of DOC's duty to Kelley, including whether it was based upon negligence or gross negligence, and (2) if the latter, whether a jury could find that Dewey was grossly negligent in supervising Ingalls.
A parole officer has "a duty to take reasonable precautions to protect anyone who might foreseeably be endangered." Taggart v. State, 118 Wash.2d 195, 218-19, 822 P.2d 243 (1992) (quoting Petersen v. State, 100 Wash.2d 421, 428, 671 P.2d 230 (1983)); see also Hertog, 138 Wash.2d 265, 979 P.2d 400 (applying the duty to a city probation counselor and a county pretrial release counselor); Bishop v. Miche, 137 Wash.2d 518, 973 P.2d 465 (1999) (applying the duty to a county probation officer). But the State, DOC, and its CCOs are by statute liable only for gross negligence in dealing with offenders in community placement:
The state of Washington, the department [of corrections] and its employees [and] community corrections officers ... are not liable for civil damages resulting from any act or omission in the rendering of community placement activities unless the act or omission constitutes gross negligence.
RCW 72.09.320. Kelley argues that because the statute applies only to the "rendering of community placement activities," it is "directed toward negligent conduct by third parties, such as treatment providers, furlough escorts, etc., rather than the actual supervision of inmates...." Thus, according to Kelley, the standard of care for a CCO is simple negligence, as in Taggart.
But this is inconsistent with the statute. First, the statute does not say that it protects third parties from liability; rather, it specifically applies to the State, DOC, and its officers and employees. RCW 72.09.320. Second, the statute contains no limitation as to the covered activities. The unrestricted phrase "community placement activities" embraces every activity related to community placement. And the statute protects the "rendering," also without limitation, of community placement activities. We hold that a community custody officer's duty is not "to take reasonable precautions to protect anyone who might foreseeably be endangered," but to refrain from gross negligence.
Gross negligence is failure to exercise slight care. Nist v. Tudor, 67 Wash.2d 322, 330, 407 P.2d 798 (1965). But this "means not the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." Nist, 67 Wash.2d at 331, 407 P.2d 798. It is "negligence substantially and appreciably greater than ordinary negligence." Nist, 67 Wash.2d at 331, 407 P.2d 798. Ordinary negligence is "the act or omission which a person of ordinary prudence would do or fail to do under like circumstances or conditions...." Nist, 67 Wash.2d at 331, 407 P.2d 798. There is no issue of gross negligence without "substantial evidence of serious negligence." Nist, 67 Wash.2d at 332, 407 P.2d 798.
Kelley contends that Dewey was grossly negligent in failing to comply with statutes and DOC rules. Specifically, Kelley contends that Dewey was grossly negligent by failing to (1) order confinement or a more restrictive status for Ingalls when he violated his curfew, possessed alcohol, and committed crimes, (2) adequately investigate Ingalls' encounters with police, and (3) make required *1193 field contacts with Ingalls.[3] The State contends that Dewey could not have taken disciplinary action against Ingalls because, to Dewey's knowledge, Ingalls had not violated any of his community custody conditions.
DOC adopts written directives that apply to its Community Corrections Division and sets procedures and requirements for CCOs in dealing with offenders. Under DOC directives, "CCOs are to enforce all conditions and requirements imposed by the court ... or Department of Corrections." Also, "CCOs are to report to the court ... if the offender fails to comply with any conditions [or] requirements of supervision." "CCOs are to investigate and report escapes whenever a Community Custody offender fails to keep a scheduled appointment or is determined to be absent from an approved location." DOC defines "escape" as "[w]illful failure to comply with any limitations on an offender's movements while in Community Custody."
A CCO has statutory authority to arrest a community custody inmate if he has reasonable cause to believe that a violation of a condition has occurred:
A community corrections officer, if he or she has reasonable cause to believe an offender in community placement or community custody has violated a condition of community placement or community custody, may suspend the person's community placement or community custody status and arrest or cause the arrest and detention in total confinement of the offender.
RCW 9.94A.207(1). The directives define "reasonable cause" as "[r]eliable information which would cause an officer to believe that a violation has occurred." CCOs must assess violations and determine whether to arrest the offender. CCOs need supervisory approval to arrest an offender, except when the offender poses a threat to the community. Once a CCO arrests an offender for a violation, the CCO must report the arrest to law enforcement for investigation and prosecution of criminal charges.
Kelley characterizes Ingalls' encounter with police in Bothell as a curfew violation. Kelley concedes that Ingalls was not actually caught violating his curfew when police found him in Bothell; he was out at 10:14 P.M. when his curfew was 11:00 P.M. But she contends that he was miles from his father's home, where he was staying, and could not have complied with the curfew. Kelley presented no evidence of how far Ingalls was from his father's home or how long it would have taken Ingalls to get to the home. Moreover, Dewey discussed the incident with Ingalls a few days later and Kelley has offered no evidence that Dewey knew or should have known from the interview that Ingalls violated his curfew. Finally, although the police found a beer in his car, Ingalls was not prohibited from consuming alcohol during community placement.
Kelley also argues that Dewey was grossly negligent in not arresting Ingalls for violating his curfew in Ocean Shores. The State argues that Dewey never knew that the Ocean Shores incident was a curfew violation and, thus, the only possible negligence was Dewey's failure to discover it. Although Dewey's notes report that Ingalls was arrested Sunday morning, he also noted that he expected to receive the police report. Dewey could not remember at his deposition whether he actually received the report. The report stated that the time of arrest was 12:50 A.M., well after Ingalls' curfew. And Dewey testified in his deposition that he would have taken Ingalls into custody because of the Ocean Shores incident if he could have.
Certainly, Dewey could have more carefully investigated the motel incident. He called the Ocean Shores police and then asked a DOC hearings officer whether Ingalls' crimes violated his community custody status. But he may not have received a copy of the police report and, if he did get it, he failed to note the actual time of arrest. Dewey apparently relied upon the information he received by phone that Ingalls was arrested on "Sunday morning." Given Ingalls' background of *1194 attempted rape, a jury could easily find that Dewey was negligent in failing to discover the actual time of the motel incident, which would have provided grounds for arrest. Dewey recognized that the incident was serious and that he would have arrested Ingalls if he could have. But Dewey's failure to more thoroughly investigate the motel incident falls short of "negligence substantially and appreciably greater than ordinary negligence." Nist, 67 Wash.2d at 331, 407 P.2d 798. If Dewey had made no attempt to learn the circumstances of the crime, a jury could find gross negligence. Here, he did investigate the circumstances but failed to verify the actual time of the arrest.
Kelley also contends that Dewey was grossly negligent in failing to make all the required field contacts with Ingalls. According to Kelley and consultant Stough, Ingalls was a Level 1A offender under DOC directives, the class of offenders subject to the highest level of supervision. Under DOC directives concerning a Level 1A offender, a CCO must complete two office contacts and four field contacts with the offender per month. The directives define "field contacts" as "[f]ace-to-face contact with the offender in the offender's routine environment which may include but is not limited to the offender's home, place of employment, community service site or treatment facility."
While Dewey met the requirement that he have two office contacts with Ingalls each month, he failed to make all of the required face-to-face field contacts. Dewey made only 14 out of at least 27 required field contacts in eight months of supervision. The State argues that the missed field contacts are "irrelevant" because Kelley has not shown that additional field contacts would have prevented Ingalls from assaulting her. We agree. Absent some evidence that Ingalls was violating his community placement conditions and that Dewey would have discovered the violations if he had made more field contacts, the missed contacts do not help Kelley.
Kelley relies in part on Bader v. State, 43 Wash.App. 223, 716 P.2d 925 (1986). There, Morris Roseberry was charged with assaulting his mother, but he was acquitted based on insanity and released on the condition that he take prescribed medication, receive treatment at a mental health treatment center, and not return to the family home. Roseberry shot and killed Hazel Massey, who lived across the street from Roseberry. Bader, 43 Wash.App. at 224-25, 716 P.2d 925. The court reversed summary judgment in favor of the treatment center, concluding that the jury could have found the center grossly negligent when it knew that Roseberry had missed several appointments, was not taking his medicine, and was exhibiting paranoid behavior, which included threatened violence. Bader, 43 Wash.App. at 229, 716 P.2d 925.
Kelley also relies upon Nist v. Tudor, 67 Wash.2d 322, 407 P.2d 798 (1965). There, Nist was a passenger in Tudor's car. Tudor slowed the car to make a left turn and took note of an oncoming truck in the far distance but failed to realize its speed. She watched a car pass her from behind and then abruptly turned left into the path of the oncoming truck, which crashed into the car and injured Nist. Nist, 67 Wash.2d at 323-24, 407 P.2d 798. The Supreme Court reversed summary judgment in favor of the driver because "a jury could well infer that [Tudor] acted in the exercise of so small a degree of care under the circumstances as to be substantially and appreciably more negligent than ordinary" when she "turn[ed] suddenly into so obvious a danger." Nist, 67 Wash.2d at 332, 407 P.2d 798.
Bader and Nist are distinguishable. In each, the defendant knew of the impending danger and failed to take appropriate action. In Bader, the treatment center failed to report that Roseberry was violating the conditions of his release even though it knew that Roseberry had missed several appointments, was not taking his medication, and was exhibiting paranoid behavior. And in Nist, Tudor knew there was a truck coming and turned in front of it anyway because she failed to realize its speed. Here, Dewey did not know of Ingalls' curfew violations. Dewey did believe that Ingalls was dangerous and stated that he would have arrested Ingalls after the Ocean Shores motel incident if he could have. But, to Dewey's knowledge, Ingalls had not violated any of his community custody conditions. And Dewey did not have *1195 authority to arrest Ingalls without reasonable cause to believe such a violation had occurred. See RCW 9.94A.207(1). Thus, Dewey's negligence is his failure to investigate and discover the violations, not failing to take appropriate action after he learned of the violations.
We conclude that the evidence is insufficient to find gross negligence. Dewey knew that Ingalls may have been drinking and may have violated his curfew the night he was in Bothell. He also knew that Ingalls had committed a crime in Ocean Shores but failed to discover that Ingalls had violated his curfewinformation that was readily available in the police report.[4] Kelley's expert opined that these deficiencies constituted negligence. We agree that a jury could so find. But we hold that this was not "substantial evidence of serious negligence" and, thus, fell short of showing gross negligence. Nist, 67 Wash.2d at 332, 407 P.2d 798.
Affirmed.
MORGAN, J., and SEINFELD, J., concur.
NOTES
[1] "`Community custody' means that portion of an offender's sentence of confinement in lieu of earned release time ... served in the community subject to controls placed on the offender's movement and activities by the department." RCW 9.94A.030(4). "Community placement" is a more general term and "may consist of entirely community custody, entirely post release supervision, or a combination of the two." RCW 9.94A.030(6).
[2] Dewey made two field contacts a month in November, January, February, and March, one field contact a month in December, April, and May, and one field contact in June.
[3] Kelley also contends that Dewey was grossly negligent in failing to adequately document Ingalls' community custody status with chronological records and with failing to monitor the drug prohibition in Ingalls' sentence. But neither Kelley nor consultant William Stough adequately explains the basis of these contentions.
[4] Dewey also failed to make all of his field contacts with Ingalls. But Kelley has not shown what Dewey would have learned in further contacts that would have prevented the attack on her.