[No. 74176-0. En Banc.]
Argued May 27, 2004. Decided September 15, 2005.

STEPHEN JOYCE, *Individually, as Personal Representative, and as Guardian, Respondent*, v. THE DEPARTMENT OF CORRECTIONS ET AL., *Petitioners*.

*Robert M. McKenna, Attorney General, Michael P. Lynch* and *Glen A. Anderson, Senior Counsel,* and *Michael E. Tardif, Assistant,* for petitioners.

*John R. Connelly, Jr.,* and *Darrell L. Cochran* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), for respondent.

*Daniel B. Heid* on behalf of Washington Association of Municipal Attorneys, amicus curiae.

*Ronald L. Williams* and *Bertha B. Fitzer* on behalf of Washington Association of Prosecuting Attorneys, amicus curiae.

*Stewart A. Estes* on behalf of Washington Cities Insurance Authority, amicus curiae.

*Debra L.W. Stephens* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 CHAMBERS, J. — ■ Washington State waived sovereign immunity more than 40 years ago. RCW 4.92.090. Implicitly, this waiver functions as a promise that the State and its agents will use reasonable care while performing its duties at the risk of incurring liability. *See, e.g., Keller v. City of Spokane,* 146 Wn.2d 237, 243, 44 P.3d 845 (2002).

¶2 The Washington State Department of Corrections (Department or State) was supervising Vernon Valdez Stewart under two felony convictions, one for assault and the other for possession of stolen property. While on this community supervision Stewart stole a car in Seattle, ran a red light in Tacoma, and collided with a vehicle operated by Paula Joyce, killing her. The Joyce family sued the Department for negligently supervising Stewart. The Department moved for summary judgment, arguing it had no duty to protect Joyce and that it was not the cause of her death. The

trial court denied the motion. A jury subsequently found the State's negligence caused Joyce's death and awarded damages to her family.

¶3 The State asks us to limit its duty to supervise offenders. In this case, the State asserts its duty is to prevent Stewart from committing assault and possession of stolen property, the crimes that triggered his supervision. But as we have long recognized, once the State has taken charge of an offender, "the State has a duty to take reasonable precautions to protect against *reasonably foreseeable dangers posed by the dangerous propensities of parolees.*" *Taggart v. State,* 118 Wn.2d 195, 217, 822 P.2d 243 (1992) (emphasis added). The existence of the duty comes from the special relationship between the offender and the State. *Cf. Hertog v. City of Seattle*, 138 Wn.2d 265, 284, 979 P.2d 400 (1999). Once that special relationship is created, the State has a duty of reasonable care and may be liable for lapses of reasonable care when damages result. However, the State also correctly argues that several jury instructions improperly stated its duty. We accordingly reverse and remand for a new trial.

## FACTS

¶4 On September 8, 1995, Stewart pleaded guilty in King County to assaulting his girl friend and threatening her with a gun. Because it was his first adult felony (after many juvenile offenses), Judge Pasette granted Stewart a first offender waiver and 24 months of community supervision. Stewart was also required to complete 72 hours of community service, have no contact with his former girl friend for five years, not purchase or possess deadly weapons, complete domestic violence counseling, make financial payments, and obey all laws.

¶5 The Department assigned Catherine Lo to supervise and monitor Stewart. Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, such offenders are monitored by community corrections officers who are authorized

to report violations of the conditions of release to the sentencing judge, if they deem it appropriate to do so. RCW 9.94A.631. The judge is authorized to fashion an appropriate response. RCW 9.94A.634(1). For example, the judge is explicitly authorized to modify the sentencing conditions by requiring education, counseling, inpatient treatment, curfew, daily reporting, home detention, jail, and other appropriate responses when an offender is noncompliant. RCW 9.94A.634(3) (formerly RCW 9.94A.200 (2001)). Under the SRA, the community corrections officer is the eyes and ears of the sentencing judge.

¶6 Joyce presented considerable evidence that the State knew of Stewart's dangerous propensities. The King County presentence report detailed Stewart's abusive relationship with his girl friend. Foretelling things to come, Stewart's criminal history included two juvenile convictions for driving without a valid license and convictions for third degree possession of stolen property and obstruction of a public servant.

¶7 Lo first met Stewart on October 17, 1995. Together they reviewed Stewart's reporting requirements and conditions of release. Lo kept a chronological log of all her contacts with Stewart. The Court of Appeals' published opinion surveyed the Department's chronological report in detail and it will not be repeated here. *Joyce v. Dep't of Corr.*, 116 Wn. App. 569, 575-85, 75 P.3d 548 (2003). It is sufficient to say that from the beginning, Stewart seldom reported as required, did not perform community service, did not receive any domestic violence counseling, and with few exceptions failed to make his $5 monthly financial obligation payments. On February 25, 1996, Lo issued a notice of violation of Stewart's community service conditions. The notice specifically documented Stewart's failure to enter domestic violence counseling, failure to perform community service, and failure to make the $5 monthly restitution payments. Despite this documented noncompliance, Lo did not take any of the steps authorized by statute to call Stewart's noncompliance to the court's attention.

¶8 On March 6, 1996, Stewart was arrested in Kittitas County driving 86 miles per hour in a 65 mile per hour zone. The car was stolen and the ignition had been popped out of the steering column. Stewart was charged with first degree possession of stolen property, third degree driving with a suspended license, and failure to sign a notice of infraction.

¶9 On April 16, 1996, Lo was informed by Stewart's mother that he had been in the Providence Hospital psychiatric ward since the previous week. Lo confirmed with the hospital that Stewart had been admitted, but the hospital refused to provide Lo details concerning Stewart's condition without a release. Lo took no action to obtain more information.

¶10 Stewart continued to not report regularly. He repeatedly failed to appear for court hearings in the King County assault case. He was finally arrested on a bench warrant on October 2, 1996, well after Lo's February 25, 1996, notice of violation. Judge Sally Phillips Pasette imposed a total of 39 days jail time and ordered Stewart to sign a release of his medical records so Lo could review Stewart's psychiatric history. It appears Lo never actually obtained this release. Lo also did not advise Judge Pasette of the Kittitas County violations, even though she had learned of them in April 1996.

¶11 Stewart was released from the King County jail on October 8, 1996, but because he failed to appear at a hearing in Kittitas County, another bench warrant was issued and he was again arrested six days later. On December 5, 1996, in Kittitas County, Stewart was found guilty of possession of stolen property and was sentenced by Judge Michael E. Cooper to 75 days in jail, 12 months community supervision, and ordered to pay restitution. As conditions of community supervision, Stewart was required to maintain law-abiding behavior, not to associate with other offenders, not to move without first obtaining permission from his community corrections officer, and to maintain or actively seek full time employment. Lo was Stewart's

community corrections officer for the Kittitas County community service.

¶12 Stewart continued to go in and out of Providence Hospital and Harborview Medical Center psychiatric departments complaining of paranoia and visual and auditory hallucinations. Had Lo required Stewart to sign the medical release as ordered by Judge Pasette and had she obtained Stewart's medical records, she and Judge Pasette would have learned of his psychiatric condition and may have been able to craft appropriate modifications to his conditions of release. Lo and the judge also would have learned that Stewart had been using marijuana, that he had stolen another vehicle from a relative by popping the ignition, and that he had pleaded guilty to driving without a license.

¶13 By March of 1997, Stewart's psychiatric condition had worsened. He had a diagnosis of acute affective psychosis. He also had still not completed any community service or domestic violence counseling as required by Judge Pasette. Neither had he found (nor was he seeking) full time employment as required by Judge Cooper. He had not provided Lo with the ordered medical release or an address where he was living. He had failed to make the financial payments required by both courts. Lo notified neither Judge Pasette nor Judge Cooper of these events.

¶14 On May 9, 1997, Lo left her position and was replaced by Odel Mosteller. Mosteller determined that Stewart had moved and the State did not have an address for him. In the meantime, Stewart's mental health had continued to significantly deteriorate.

¶15 On July 22, 1997, mental health officials responded to Stewart's mother's home. Stewart had been smashing doors, cutting holes in walls with a knife, and setting fires. He was taken to the King County jail and released on July 24, 1997. Mosteller never met Stewart and never obtained Stewart's medical records. But even without taking these steps, Mosteller knew Stewart was noncompliant. Four days later, on July, 28, 1997, Mosteller issued two notices of

violation of Stewart's conditions of community supervision. The first, filed in Kittitas County, indicated that Stewart had failed to report since May 2, 1997,[1] had failed to notify his community corrections officer before changing his address, and had failed to pay his legal fees. The second, filed in King County, additionally reported that Stewart had failed to appear in King County court on a charge of driving with a suspended license. In each notice of violation, Mosteller recommended that the court schedule a hearing and that the court sanction Stewart with 20 days in jail.

¶16 Ten days after filing the notices of violation, Mosteller received a call from a newspaper reporter. Mosteller learned for the first time of the motor vehicle collision that killed Paula Joyce. It appears that in the early morning hours of August 8, 1997, Stewart succumbed to old temptations and stole a Chevrolet Suburban in Seattle. He broke off a portion of the steering column and hot-wired the vehicle with a screwdriver. He proceeded down Interstate 5, veered off onto Highway 16 and exited at Union Street in Tacoma. He reached speeds of 60 to 70 miles per hour through surface streets in Tacoma, ignoring red lights, and did not stop until he rammed into the small pickup truck driven by Joyce, killing her. Two baggies containing 1.6 grams of marijuana were found on Stewart and a toxicology report showed that he was under the influence of marijuana at the time of the collision.

¶17 Joyce's family brought suit against Stewart and the State. A jury found the State liable. The Court of Appeals affirmed, and we granted review. *Joyce v. Dep't of Corr.*, noted at 150 Wn.2d 1032 (2004).

## ANALYSIS

### 1. DUTY

¶18 The State contends the trial court erred in denying its motion to dismiss as a matter of law on the

---

[1] On April 2, 1997, Stewart had reported to Lo's office but Lo was on leave.

theory it simply owed no duty to Paula Joyce. But this confuses the *existence* of a duty with the *scope* of the duty. While we recognize that a community corrections officer arguably has less power than a parole officer, this does not change the bedrock fact that the State still has a duty to use reasonable care once it takes charge of an offender.

¶19 Once the theoretical duty exists, the question remains whether the injury was reasonably foreseeable. *Taggart,* 118 Wn.2d at 217, 226; *see also* RESTATEMENT (SECOND) OF TORTS § 319 (1965). Depending on the facts of the case, it may be appropriate to instruct the jury on the specifics of the judgment and sentence, and the conditions of release, to aid them in deciding whether the State failed to exercise reasonable care or whether its negligence caused the plaintiff's injury.

¶20 But the Department seeks to drastically narrow the State's duty of reasonable care as a matter of law. It notes, rightly, that the State's authority to supervise *arises* from the conditions of release contained in a judgment and sentence for a crime. Under some circumstances, the specifics of those documents may limit the State's duty. But Stewarts' conditions of release were not limited to the payment of financial obligations, as we discuss below in the context of *Couch v. Department of Corrections,* 113 Wn. App. 556, 54 P.3d 197 (2002), *review denied,* 149 Wn.2d 1012 (2003). Stewarts' conditions of release for his two felonies were extensive, including the requirement that he obey all laws and maintain an address and employment.

¶21 Alternatively, the Department argues, there must be a nexus between the crime for which the offender is convicted and the subsequent act which causes harm and that this nexus is lacking. We conclude that such a nexus may be relevant and properly brought before the jury, but while the offender's conditions of release are relevant to what is foreseeable, it is not the only basis for determining foreseeable dangerous propensities.

¶22 Finally, the Department argues that there is something so fundamentally different between a community

corrections officer and a probation officer that our prior holdings do not apply. We disagree. We have answered all of the questions raised by the State about its duty before.

¶23 The leading case is *Taggart*, where the State contended that none of its actions were a legal proximate cause of Taggart's injuries when a supervised offender, last incarcerated for car theft, assaulted Taggart. *Taggart*, 118 Wn.2d at 225-27. We rejected the State's legal cause argument and concluded that "parole officers have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities." *Taggart*, 118 Wn.2d at 224. Essentially, that is the same question before us today.

¶24 We also rejected the State's argument that recognizing this duty would require the State to monitor more intensively than the State's resources allow. We reasoned:

> The parole officer is the person through whom the State ensures that the parolee obeys the terms of his or her parole. Additionally, parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress during parole. Because of these factors, *we hold that parole officers have "taken charge" of the parolees they supervise for purposes of* [Restatement (Second) of Torts] *§ 319. When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm.*

*Taggart,* 118 Wn.2d at 220 (emphasis added).

¶25 We see no reason to categorically distinguish community corrections officers from others who actively supervise offenders. *Compare* RCW 9.94A.631, .634 (community supervision) *with* RCW 72.04A.080 (parole). In each, the government has assumed the duty of supervising an offender's conduct. In each, the government has the ability to take steps to ensure, as a condition of release, that the offender complies with the conditions of release. In each, the government has the duty of reasonable care in executing its duties. Under the facts of this case, a jury could conclude

that this duty was breached by the State's failure to report egregious violations of the conditions of release to the court so that the trial judge could take action appropriate to the offender's conduct. As discussed below, the duties of the community corrections officers supervising Stewart were almost identical to the duties of the parole officers in *Taggart,* based on the actual judgment and sentence and the conditions of release.

¶26 Furthermore, we have already recognized a duty to use reasonable care in supervising offenders under other types of community supervision programs. *See Hertog v. City of Seattle,* 138 Wn.2d 265, 979 P.2d 400 (1999) (recognizing a similar duty of city probation officers and county pretrial release counselors); *Bishop v. Miche,* 137 Wn.2d 518, 973 P.2d 465 (1999) (recognizing a duty of county probation officers).[2] Finally, the Department had a specific obligation, enumerated in the conditions of release, to use reasonable care to ensure Stewart obeyed all laws. *See also* RCW 9.94A.631 ("If an offender violates any condition or requirement of a sentence, a community corrections officer may arrest or cause the arrest of the offender without a warrant."). There was sufficient evidence of breach of this obligation to go to the jury.

¶27 Since *Taggart,* state agencies have continued to argue in a variety of venues (judicial, legislative, and otherwise) that *Taggart* should be reversed. Alternately, they have argued that, as a matter of law, there is no causal link between their failure to use reasonable care to monitor and supervise offenders and the foreseeable injuries caused by offenders. Illustratively, in *Bishop,* King County argued

[2] We note that the Department cites several cases which seem at first to factually support its argument. Upon review, we disagree. Several predate *Taggart* and are substantially overruled by it; the other concerns a supervisee on pretrial release, constitutionally entitled to the least restrictive supervision possible. *See McKenna v. Edwards,* 65 Wn. App. 905, 916, 830 P.2d 385 (1992); *Noonan v. State,* 53 Wn. App. 558, 769 P.2d 313 (1989); *Baumgart v. Grant County,* 50 Wn. App. 671, 750 P.2d 271 (1988). Another case is not relevant to our analysis because it determined whether a state agent had qualified immunity from suit, not whether a duty existed. *See Savage v. State,* 127 Wn.2d 434, 899 P.2d 1270 (1995) (holding that even though a parole officer may enjoy qualified immunity, it did not extend to the government).

that a breach of the duty of reasonable care simply could not be a proximate cause of injury when an intoxicated probationer with a history of substance abuse caused a motor vehicle collision that killed a child. *Bishop*, 137 Wn.2d at 531. We explicitly rejected the county's contention and found that a duty to use reasonable care did exist.

¶28 Again, in *Hertog*, the city argued that *Taggart* was wrongly decided and should be overruled because parole officers do not have any real control over the day-to-day lives of parolees, and, it contended, a failure to supervise could not be the proximate cause of injuries intentionally inflicted by supervised parolees. *Hertog,* 138 Wn.2d at 283-84. Again, we rejected the argument. We held that "[w]here a special relation exists based upon taking charge of [an offender], the ability and duty to control [the offender] indicate that the defendant's actions in failing to meet that duty are not too remote to impose liability." *Hertog,* 138 Wn.2d at 284.

¶29 Again, at the heart of the State's argument in this case is that its authority to supervise is limited by the judgment and sentence and the conditions of release. It argues that since these documents must be related to the underlying crime, its *duty* should similarly be limited. But the State misconstrues the relationship between the under-lying conviction that triggers the special relation with the offender and its own consequent duty. The *duty* arises from the special relationship between the government and the offender. The judgment and sentence and the conditions of release are critical because they create the relationship, which in turn creates the duty.

¶30 Again, we have been here before. We surveyed the nature of the State's duty in supervising offenders in detail in *Bishop* and again held that relevant threshold questions are whether the State had a take-charge relationship with the offender and whether the State knew or should have known of the offender's dangerous propensities. *Bishop,* 137 Wn.2d at 524 (citing *Taggart*, 118 Wn.2d at 219). And again, we affirmed that the conditions of release are important

because they create the relationship. *Bishop,* 137 Wn.2d at 527. However, once the relationship is created, it is the *relationship* itself which ultimately imposes the duty upon the government, and "the *failure* to adequately monitor and report violations, thus failure to adequately supervise the probationer," may result in liability. *Bishop,* 137 Wn.2d at 526.

¶31 Conversely, if the judgment and sentence and the conditions of release do not create a take-charge relationship, then no duty exists. For example, no take-charge relationship existed between the government and the offender in *Couch,* 113 Wn. App. 556. There, the supervised offender, Davis, brutally murdered Couch while technically under the Department's supervision. However, Davis had completed community placement and was under only *financial* supervision to ensure he made his $20 per month payments. As the Court of Appeals properly noted, the "DOC [Department of Corrections] can question the offender, but only on economic matters like earning capability and assets. So long as the offender pays the LFOs [legal financial obligations] on schedule, DOC is not authorized to intervene in his or her other activities, even if it believes those activities to be criminal—and if DOC is not authorized to intervene, it cannot have a duty to do so." *Couch,* 113 Wn. App. at 569. Based upon the Department's limited authority to supervise Davis, the Court of Appeals properly found no take-charge relationship.

¶32 But Stewart's relationship with the Department is essentially the same as the one discussed in *Bishop.* There, the probation officer had the authority and the duty to supervise the offender and report to the court if he failed to comply with " 'all terms, conditions, rules and regulations of the Probation Department' " during his two-year probation period. *Bishop,* 137 Wn.2d at 528. Accordingly, a duty exists. *Id.* at 532.

¶33 In *Taggart,* we held that a duty would exist where there was a " 'definite, established and continuing relationship' " in which the State (1) regulated a parolee's move-

ments within the state, (2) required the parolee to report to the parole officer, (3) imposed special conditions such as refraining from using alcohol, and (4) ordered the parolee not to possess firearms. *Taggart*, 118 Wn.2d at 219-20 (quoting *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)). Because parole officers in *Taggart* enforced all these requirements and had statutory authority to supervise parolees—which included ensuring that the parolees obey the terms of parole, monitoring parolees' progress during parole, and being aware of their parolees' criminal histories—we concluded that the parole officers had taken charge of the parolees. *Taggart*, 118 Wn.2d at 220.

¶34 Similarly, Stewart was required to: (1) remain in King County, (2) secure permission from a community corrections officer before leaving Washington or changing residence, (3) work at a Department approved education or employment program, (4) pay legal financial obligations, (5) report in person and by appointment to the community corrections officer, (6) not consume or unlawfully possess controlled substances, (7) complete 72 hours of community service, (8) not possess firearms, and (9) abide by other court-imposed conditions. The Department maintained a definite, established, and continuing relationship by assigning a community corrections officer to monitor and to notify the judge if Stewart failed to substantially comply with the court's conditions of release. A duty existed.[3]

---

[3] We respectfully disagree with the concurrence/dissent's characterization of our holding. Our opinion should not be read to change the long standing legal principle that when the *authority* to do an act does not exist, the *duty* to do the act also does not exist. *E.g., Brown v. MacPherson's, Inc.,* 85 Wn.2d 17, 19, 530 P.2d 277 (1975). But that is not the case before us. The community corrections officers had the authority to report Stewart's repeated violations of the conditions of release to the court and had the authority to investigate the decompensation of his mental health and did not do so. Authority existed. Instead, the State is essentially asking us to hold that when it is not specifically *ordered* to do an act, it has no *duty* to do the act. The concurrence/dissent would effectively overrule many of this court's decisions and cast great doubt upon our jurisprudence relating to the duty of governments in general.

We reaffirm our commitment of not requiring the impossible. We are merely holding that where, as here, the State has a special relationship with an offender by virtue of its actual obligation and authority to supervise, then a duty to prevent foreseeable injury to others follows. Whether or not the injury is foreseeable, and

## 2. Legal Cause

■ ¶35 The State also argues that we should conclude, as a matter of law, that the State's negligence was not the cause of Joyce's death because, it contends, even if it had properly monitored Stewart and reported violations to the court, it is unknown what action, if any, the court could have taken. Therefore, argues the Department, any causal connection between breach of duty and Joyce's death is too speculative. This argument is predicated on a misunderstanding of our reasoning in *Bishop*, 137 Wn.2d 518 and *Bell v. State,* 147 Wn.2d 166, 178-79, 52 P.3d 503 (2002).

¶36 It is true that *if* the Department had properly supervised the offender and reported his violations, and *if* a judge had nonetheless decided to leave Stewart at large in the community, the causal chain may have been broken as a matter of law. That is what we held in *Bishop*. Even though the judge in *Bishop* was aware that the supervised offender had violated conditions of probation, that he had a severe alcohol problem, and that he had willfully "[driven] after his license had been suspended, the judge did not revoke probation." *Bishop,* 137 Wn.2d at 532. "As a matter of law, the judge's decision not to revoke probation under these circumstances broke any causal connection between any negligence and the accident." *Bishop,* 137 Wn.2d at 532. If the Department had properly monitored Stewart and reported his violations to either of the two sentencing judges, and if the Department had unsuccessfully asked for judicial action, the causal chain would have been broken.

¶37 Similarly, in *Tyner*, we noted "the duty of CPS [Child Protective Service] workers to investigate exists apart from any action which might be taken by a court." *Tyner v. Dep't of Soc. & Health Servs.,* 141 Wn.2d 68, 83, 1 P.3d 1148 (2000). *Accord Bell,* 147 Wn.2d 166 (noting State's duty to supervise parolees). In the absence of an actual intervening

whether or not the State has breached that duty are questions for a jury and should not be decided as a matter of law unless reasonable minds could not differ.

act by a court, the court does not act as an intervening cause.

¶38  We affirm the Court of Appeals that the State was not entitled to dismissal on the basis of proximate cause.

### 3. CAUSE IN FACT

¶39  In addition to legal cause there must be cause in fact. To establish cause in fact, a claimant must establish that the harm suffered would not have occurred but for an act or omission of the defendant. There must be a direct, unbroken sequence of events that link the actions of the defendant and the injury to the plaintiff. *Taggart,* 118 Wn.2d at 226. Cause in fact is usually a question for the jury; it may be determined as a matter of law only when reasonable minds can not differ. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985).

¶40  The Department contends that there was insufficient evidence to support the jury's finding of cause in fact. We disagree. Stewart had a known history of drug abuse. Had the State obtained medical records as directed by Judge Pasette, it would have learned of Stewart's drug use, visual and auditory hallucinations, and episodes of psychotic behavior. The State knew of Stewart's propensity to drive stolen vehicles of speeds at least up to 86 miles per hour.

¶41  It is undisputed that Stewart committed numerous violations of his supervision that were not reported to the court or diligently pursued by community corrections officials. A court had previously sentenced Stewart to jail time for reported violations. Joyce's expert, William Stough, testified that if the Department had obtained a bench warrant for Stewart prior to the accident, he "would have been in jail, either awaiting a hearing or doing time on the violations" without bail on August 8, 1997. 5 Report of Proceedings (RP) at 792. While we recognize that a reasonable jury could have decided against the plaintiff on this issue, especially if properly instructed, the trial court did

not err in denying the Department's motion to dismiss as a matter of law.

## 4. INSTRUCTION 16

■ ¶42 The Department also argues that a number of jury instructions were erroneous and require reversal. We agree. "Jury instructions are sufficient if they allow the parties to argue their theories of the case, do not mislead the jury and, when taken as a whole, properly inform the jury of the law to be applied." *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995) (citing *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 36, 864 P.2d 921 (1993)). We review, de novo, jury instructions for errors of law, and error is reversible where it prejudices a party. *Id.*

¶43 Instruction 16 stated: "[t]he Department of Corrections, through its community corrections officers, is legally responsible for reporting violations of any conditions of community supervision to the Superior Court which sentenced the felon and must take action within 30 days of learning of a violation." Clerk's Papers (CP) at 2044. This instruction was based upon a Department policy directive and plainly suggests that a community corrections officer is legally required to report any violation. The Department contends that this instruction was erroneous because as a policy directive it did not have the force of law.

■ ¶44 Unlike administrative rules and other formally promulgated agency regulations, internal policies and directives generally do not create law. *See Melville v. State*, 115 Wn.2d 34, 793 P.2d 952 (1990). *Melville* indicates, however, that where a policy directive is the equivalent of a liability-creating administrative rule, such status may endow the directive with the force of law. *Id.* at 39-40. But because the Department's policy directives are not promulgated pursuant to legislative delegation, they do not have the force of law. *See State v. Brown*, 142 Wn.2d 57, 62, 11 P.3d 818 (2000).

¶45 Internal directives, department policies, and the like may provide evidence of the standard of care and therefore be evidence of negligence. Thus in *Bishop* the court looked to a municipal probation department manual setting forth the probation officer's duty to report violations to the court within a specific time frame. *Bishop*, 137 Wn.2d at 522. Similarly, in *Tyner*, 141 Wn.2d at 87-88 and note 8, which involved a father's claim of negligent investigation of child abuse against Child Protective Services (CPS), the jury was informed that CPS's own manual required it to contact key collateral sources in investigating child abuse allegations. *See also Kelley v. State*, 104 Wn. App. 328, 334-35, 17 P.3d 1189 (2000) (violation of policy directives may be evidence of gross negligence).

¶46 When policy directives are offered as evidence of negligence, the jury should be provided WPI 60.03, (6 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 60.03, at 481 (2005) (WPI))[4] or a similar instruction which clarifies that a violation is not negligence per se. Here, the jury was instructed that the community corrections officer was legally required to report violations within 30 days, and the State was not given an instruction which would have permitted it to argue that the directive was only evidence of negligence. Reading the instructions as a whole, the State was not meaningfully allowed to argue its theory of the case because the jury was misdirected.

¶47 The Department preserved its objection to the instruction. Though it could have been clearer, counsel for the State argued that the instruction was legally incorrect and that violation of the directive constituted, at most,

---

[4] The instruction states:

The violation, if any, of a [statute] [ordinance] [administrative rule] is not necessarily negligence, but may be considered by you as evidence in determining negligence.

[Such a violation may be excused if it is due to some cause beyond the violator's control, and that ordinary care could not have guarded against.]

WPI 60.03 (alterations in original).

evidence of negligence.[5] The Department thus met the requirements of CR 51(f), which does not require that a party additionally propose an alternative instruction under these circumstances.

¶48 In short, the Department properly objected to a legally erroneous jury instruction which prevented the Department from properly arguing its theory of the case to the jury. Accordingly, we are constrained to reverse and remand for a new trial.

## 5. INSTRUCTION 20

¶49 Because this issue is likely to arise on remand, we briefly address it here. Instruction 20 stated that: "[a] community corrections officer may arrest or cause the arrest of an offender, without a warrant, when the offender violates any condition or requirement of a sentence or when an offender presents a danger to the community." CP at 2048. This instruction, like instruction 16, was given based on an internal policy directive. On the basis of this instruction, Joyce argued that a community corrections officer has a duty to arrest whenever an offender presents a danger to the community. As with instruction 16, the underlying policy directive does not have the force of law and is legally

---

[5] From the colloquy on jury instructions:

MR. ANDREWS: All right. I just want to make it clear that with regards to the directive especially, that those are not law. They don't even rise to the level of a regulation, and as far as—

THE COURT: Well, let me ask you this, Mr. Andrews, just for the purpose of the record. What do you suppose those directives are for? Just for casual reading?

MR. ANDREWS: For guidance to the CCOs [community correction officers].

THE COURT: Merely guidance? They don't have to comply with those; is that what you're telling me?

MR. ANDREWS: I'm saying that the intent is for them to comply with them, yes, but that they are not as, according to a legal standard, that that is absolute law. That is, we've got RCW 5.40.050 that talks about, you know, even statutes and regulations that are only evidence of negligence, and this doesn't even rise to those levels. And that's been consistently our argument throughout this case.

THE COURT: Okay. Next.

10 RP at 1490.

erroneous. At most, the directive might be argued as evidence of negligence, prompting a WPI 60.03 instruction. Additionally, the instruction fails even to accurately state the directive at issue. At a minimum, the directive does not allow a community corrections officer, without supervisory approval, to arrest an offender who endangers community safety unless a warrant is outstanding.

¶50 The instruction, and Joyce's arguments based upon the instruction, prevented the Department from arguing its theory of the case. Joyce contends the Department failed to preserve this error because its objection was insufficiently specific. However, because we are reversing and remanding because of the error in instruction 16, we need not determine whether or not the Department preserved its error here.

### 6. REMAINING ISSUES

¶51 The Department argues that a number of statements made during Joyce's closing argument were improperly made to "send a message to Olympia." However, "[r]emarks of counsel in argument claimed to be so prejudicial as to warrant a reversal . . . must be brought to the trial court's attention and a curative admonition or instruction requested." *Kain v. Logan*, 79 Wn.2d 524, 528, 487 P.2d 1292 (1971). The Department contends that its continuing objection, established by a motion in limine, was sufficient to meet its obligation to object. However, even if the Department were permitted to rely on its continuing objection, it failed to request a curative admonition or instruction. Given our overall disposition, it is unnecessary to decide whether the remarks were improper. Similarly, we do not reach whether instructions 5 and 13 were properly given.

CONCLUSION

¶52  We affirm in part, reverse in part, and remand to the trial court for further proceedings in accordance with this opinion.

ALEXANDER, C.J.; C. JOHNSON, MADSEN, and OWENS, JJ.; and IRELAND, J. Pro Tem., concur.

¶53  FAIRHURST, J. (dissenting in part and concurring in part) — Tragic facts alone are not an appropriate basis for establishing a new rule of law. The Department of Correction's (DOC) duty to supervise Vernon Valdez Stewart for assault and possession of stolen property did not extend to preventing the automobile accident that killed Paula Joyce. I respectfully dissent from the majority's conclusion on duty.

¶54  "In a negligence action the threshold question is whether the defendant owes a duty of care to the injured plaintiff."[6] *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 474, 951 P.2d 749 (1998).

¶55  The majority, like the Court of Appeals, essentially concludes that community supervision inherently gives rise to a take-charge relationship and, without examining the contours or extent of that take-charge relationship, holds that there is a general duty. *See Joyce v. Dep't of Corr.*, 116 Wn. App. 569, 587, 75 P.3d 548 (2003); Majority at 315. The majority reasons that it makes sense to find a duty in this context because like other situations where offenders are supervised, community corrections officers (CCOs) have: (1) "assumed the duty of supervising an offender's conduct," (2) "the ability to take steps to ensure . . . that the offender complies with the conditions of release," and (3) "the duty of reasonable care in executing its duties." Majority at 316. Therefore, the majority reasons, whether DOC owed Joyce

---

[6] Only once a duty is established does foreseeability of injury establish the *scope* of that duty; the scope is irrelevant if no duty exists. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 475, 951 P.2d 749 (1998).

a duty is a question of *scope* of the duty, not *existence* of the duty, and was properly put before the jury. Majority at 314-15.

¶56 Whether DOC owed a duty to Joyce requires a more robust analysis of whether and to what extent DOC had a take-charge special relationship with Stewart than the Court of Appeals or the majority puts forth. DOC's take-charge relationship with offenders, and in turn its duty to supervise them, must be related to its supervision authority which, in the community supervision context, is limited to enforcement of crime-related supervision conditions.

¶57 *Taggart* and *Bishop* held that the take-charge relationship, which creates the duty, was defined by the supervisor's statutory authority and by the conditions of release. *See Bishop v. Miche*, 137 Wn.2d 518, 527, 973 P.2d 465 (1999); *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992). The Court of Appeals has clarified that a "community corrections officer must have a court order before he or she can 'take charge' of an offender; and even when he or she has such an order, he or she can only enforce it according to its terms and applicable statutes." *Couch v. Dep't of Corr.*, 113 Wn. App. 556, 565, 54 P.3d 197 (2002), *review denied*, 149 Wn.2d 1012, 69 P.3d 874 (2003).

¶58 But the majority reasons that although the State's authority to supervise, which creates the take-charge relationship and, in turn, the duty, is based on the supervision conditions, once the take-charge relationship and the corresponding duty is established, it is limited only by foreseeability of injury, not by the supervision conditions and the corresponding authority. Majority at 318. That conclusion logically does not make sense. How can specific conditions of release and the authority created therein give rise to a take-charge relationship and a corresponding duty, but the duty created be in no way limited by the supervision conditions and authority through which the duty was enabled? The majority essentially holds that as long as DOC has supervision authority over offenders, a take-charge relationship and, in turn, a duty, is created that

extends to all areas, limited only by foreseeability of injury. But that is not what the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, intended. The need for a relationship between authority to supervise and duty is especially evident in the community supervision context.

¶59 " 'Community supervision' " is defined as "a period of time during which a convicted offender is subject to crime-related prohibitions and other sentence conditions." RCW 9.94A.030(9). A CCO's take-charge ability and his authority to control supervisees is significantly more narrow and limited than that of the parole officers analyzed in *Taggart*. " '[C]ommunity supervision' is significantly different from traditional concepts of probation or parole. . . . The only conditions of 'community supervision' authorized are 'crime-related prohibitions' and 'other sentence conditions' imposed pursuant to the Act." DAVID BOERNER, SENTENCING IN WASHINGTON § 4.4, at 4-4 (1985). Moreover, CCOs "have a significantly different role than probation or parole officers had under the former system." *Id.* § 4.4, at 4-5. While CCOs *do* "have search and arrest powers, these powers *are limited* to *violations of 'a condition or requirement of a sentence.'* Thus, their power *is restricted by the nature of the conditions or requirements of sentences permitted under the Sentencing Reform Act.*" *Id.* § 4.4, at 4-5, 4-6 (emphasis added) (footnotes omitted). The authority of CCOs and, in turn, of DOC, is limited to enforcement of specific crime-related prohibitions and other sentence conditions.

¶60 DOC's duty, therefore, is more limited in the community supervision context under the SRA than it was in the parole context discussed in *Taggart*. In *Taggart*, we held that the State had "a duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities" of the parolee. *Taggart*, 118 Wn.2d at 217. In the context of community supervision under the SRA, however, that duty translates differently. In community supervision, DOC's duty is to enforce the crime-related supervision conditions and prevent foreseeable crimes caused by violations thereof—that is all DOC has the authority to do.

¶61 Here, DOC did not have a sufficient take-charge relationship over Stewart to create a duty to prevent the accident. At the time of the accident, Stewart was on community supervision for two separate felonies: second degree assault and second degree possession of stolen property. Stewart was required to regularly report to his CCO, pay legal financial obligations (LFOs), and report changes in his address. The conditions of supervision relating to Stewart's assault conviction were (1) prohibition against contacting his former girl friend, (2) prohibition on possessing deadly weapons, (3) requirement to attend domestic violence counseling, and (4) requirement to obey all laws. He was also required to perform 72 hours of community service as part of his converted sentence. The conditions for his stolen property conviction were (1) prohibition against association with other offenders, (2) requirement to enroll in school or obtain employment, and (3) requirement to obey all laws. None of those conditions involved Stewart's driving or mental health, the issues that respondent argues DOC should have monitored to prevent the accident.[7] Indeed, DOC had no specific authority to intervene in Stewart's driving-related behaviors or mental health issues. Furthermore, we cannot conceive that a generic condition requiring a first time offender to obey all laws was intended to impose on DOC a duty to prevent any potential new crime.[8]

¶62 It is nonsensical to hold that DOC has a duty to control that which it does not have the authority to control. One who lacks the authority or power to do something

---

[7] The majority tries to make much of the fact that Stewart's CCO did seek and receive an order allowing her to access Stewart's mental health records. However, contrary to the majority's assertion, it is not clear that the judge ordered the release so that the CCO could monitor Stewart's psychiatric issues. *See* majority at 312-13. No new supervision condition was entered requiring or authorizing the CCO to monitor Stewart's mental health.

[8] Rather than imposing upon DOC a duty to prevent all future crime, the obey all laws requirement is associated with the first time offender waiver, where courts waive standard range sentences for certain first time offenders, but require that they maintain law-abiding behavior and fulfill other conditions specific to the waiver. *See* RCW 9.94A.650(2); *see also* Pl's. Ex. 6, part 4.4, where the sentencing judge utilized the first time offender waiver.

cannot be held liable for failing to do that thing. *See Brown v. MacPherson's Inc.*, 85 Wn.2d 17, 19, 530 P.2d 277, *reh'g granted,* 86 Wn.2d 293, 545 P.2d 13 (1975); *Couch,* 113 Wn. App. at 569 ("[I]f DOC is not authorized to intervene, it cannot have a duty to do so.").

¶63 This principle was applied recently to the community supervision context by the Court of Appeals in *Couch.* There, the estate of a murder victim sued DOC for failing to prevent the victim's murder. *Couch,* 113 Wn. App. 556. At the time of the murder, however, the offender was only on community supervision for payment of LFOs. *Id.* at 559. Although DOC did have some *control* over the offender—DOC could require him to report or question him—that control related *only* to the offender's payment of his LFOs. DOC could not intervene in his other activities. *Id.* at 569. The Court of Appeals held that if DOC did not have authority to intervene in the offender's other activities, it did not have a take-charge relationship over those activities and could not have a duty to intervene.[9] *Id.*

¶64 Following the reasoning of *Taggart, Bishop,* and *Couch,* DOC did not have a take-charge relationship regarding Stewart's driving or mental health. Therefore, DOC had no duty to prevent driving-related behavior, including the accident at issue here. This conclusion is consistent with our holding in *Taggart.* The majority's decision finding a duty here actually expands *Taggart* by creating a duty broader than the scope of authority granted by the supervision conditions. *See Estate of Bordon v. Dep't of Corr.*, 122

---

[9] The majority states that "[u]nder some circumstances, the specifics of [the conditions of release contained in a judgment and sentence] may limit the State's duty." Majority at 315 (citing *Couch,* 113 Wn. App. 556). The majority concludes that because Stewart's conditions of release were not limited to LFOs, the conditions of release do not limit DOC's duty. But this court has never held that LFOs are the only context in which the supervision conditions determine the duty of CCOs—we have not before considered this issue. The Court of Appeals opinion in *Couch* does not appear to limit the relationship between duty and the supervision conditions to conditions regarding LFOs. Instead, the court reasoned that if the supervision conditions did not give DOC the *authority* to do something, it could not have a *duty* to do so. That same principle applies here—because DOC did not have the authority (through supervision conditions) to monitor Stewart's driving or mental health, it cannot have had the duty to do so.

Wn. App. 227, 236 n.19, 95 P.3d 764 (2004) (reasoning that the Court of Appeals decision in *Joyce* appeared to find a duty "in the absence of any court-imposed condition authorizing" DOC to take the desired action. *"Joyce* seems to expand the holding in *Taggart* by ruling that DOC's duty does not depend on there being a nexus between the offender's crimes and conditions of supervision and the behavior that caused the plaintiff's injury."), *review denied,* 154 Wn.2d 1003 (2005)[10]

¶65 The majority implies that because DOC *could have* requested that Stewart be incarcerated for violating one of the supervision conditions over which it had authority, it *should have* done so to prevent the accident. But the mere ability to prevent harm does not create a duty to do so. Although DOC could have sought a bench warrant to arrest Stewart for his LFO and reporting violations, it did not have to seek arrest. Instead, the CCO monitoring Stewart at the time leading up to the accident filed a violation report and requested a hearing. The CCO claims that he chose that course of action because Stewart had not violated his crime-related conditions, contacted his victim, or committed any violent crimes. Such prioritizing is part of DOC's discretion and is necessary to the efficient operation of the community supervision program. The majority's imposition of a duty here will force DOC to seek arrest for any minor violation to prevent future liability.

¶66 Imposing a duty here also encourages DOC to use general supervision authority and enforcement of generic conditions as a pretext for controlling supervisee behavior

---

[10] *Bordon* involved facts that (unlike those present here) did support a duty for DOC to prevent a car accident. There, an offender on community supervision, who was being *supervised for driving-related behavior,* borrowed a car and crossed the center lane of a road while intoxicated, killing a woman. *Bordon,* 122 Wn. App. at 231. The victim's family sued DOC for negligent supervision of the offender. *Id.* at 234. The Court of Appeals held that a supervision condition mandating that the offender only drive with a valid license, where the Department of Licensing had revoked his driving privilege for 365 days, was "sufficient to give rise to a duty under *Taggart* to protect the public from *foreseeable behavior associated with that condition." Id.* at 237 (emphasis added). A similar driving condition is noticeably absent here. Without a driving-related condition, DOC cannot have a similar duty to protect the public from Stewart's driving.

unrelated to their supervision conditions. The legislature did not intend that result—the SRA gives DOC the authority to control only crime-related behavior. Furthermore, such pretext has been held improper. For example, Division Three of the Court of Appeals held that polygraph testing ordered as part of release conditions could be used "to monitor only [the offender's] compliance with the community placement order and *not as a fishing expedition to discover evidence of other crimes*, past or present." *State v. Combs*, 102 Wn. App. 949, 953, 10 P.3d 1101 (2000) (emphasis added).

¶67 Based on the conditions of release, DOC had only limited authority to monitor Stewart, which did not include authority to monitor or control behavior related to his driving or mental health. Therefore, DOC did not have a duty to prevent the car accident that killed Joyce.

¶68 Even if a general duty attached due to the supervision condition requiring Stewart to obey all laws, the accident that killed Joyce was unforeseeable to DOC as a matter of law, and DOC therefore did not have a duty to prevent it. The Joyces had the burden to prove the scope of the duty extended to Paula Joyce by showing that she was "foreseeably endangered." *Taggart*, 118 Wn.2d at 224. " 'Foreseeability is normally an issue for the jury, but it will be decided as a matter of law where reasonable minds cannot differ.' " *Id.* (quoting *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989)).

¶69 In the community supervision context, the scope of DOC's duty extends to foreseeable behavior associated with the *supervision conditions*. *Bordon*, 122 Wn. App. at 237 (reasoning that the offender's danger to the driving public would have been foreseeable if DOC had known about the offender's conviction for eluding police and the corresponding driving-related condition). DOC cannot be expected to foresee behavior unrelated to the substantive or crime-related conditions under which they are monitoring supervisees. This is especially true if we are willing to extend to DOC a duty to prevent supervisees from commit-

ting future crimes based solely on a supervision condition requiring them to maintain law-abiding behavior. If we did not limit DOC's foreseeability to behavior associated with crime-related supervision conditions, we would make DOC an insurer for any new crime committed by a supervisee that was similar to a behavior or lack of judgment that person demonstrated in the past but which *the courts did not see fit to include in the supervision conditions.*[11] The majority asks too much of DOC—it cannot be an insurer of all crimes.

## CONCLUSION

¶70 Because DOC did not have authority to intervene in Stewart's driving or mental health, it also did not have a duty to prevent the car accident that killed Paula Joyce. But even if some general duty attached based on the "obey all laws" supervision conditions, the accident that killed Joyce was unforeseeable to DOC as a matter of law because Stewart's behavior that caused the accident was unrelated to the conditions for which DOC was supervising him. I therefore dissent from the majority's willingness to impose upon DOC a duty to prevent behaviors in which it has no authority to intervene and for which trial courts did not see it necessary to have DOC monitor.

SANDERS and BRIDGE, JJ., concur with FAIRHURST, J.

Reconsideration denied December 6, 2005.

---

[11] Furthermore, the majority exaggerates the similarities between Stewart's past crimes and the accident that killed Joyce. The opinion asserts that Stewart's past crimes were so similar to the crime causing Joyce's death that they "foretold" the crimes resulting in Joyce's death, and that he "succumbed to old temptations" by committing the current crimes. Majority at 311, 314. The opinion points to Stewart's juvenile convictions for driving without a license and possession of stolen property, his conviction for possession of stolen property (the conviction for which he was being supervised), and his conviction for obstructing a public servant. Majority at 311. Even though Stewart may have had a propensity for making bad decisions including stealing cars, it was not the theft of the automobile or possession of stolen property that killed Joyce, it was Stewart's negligent driving and running of a red light. Neither the majority nor respondent points to evidence of Stewart's criminal history including past convictions for reckless driving or driving under the influence which, unlike possession of stolen property, perhaps come closer to "foretelling" the actions that killed Joyce.