IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RAZ YARON, an individual and Washington State resident,<br><br>                Appellant,<br><br>           v.<br><br>SIERRA S. CONLEY, an individual and Washington State resident,<br><br>                Respondent. | No. 80120-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

SMITH, J. — This case presents an issue of first impression involving the Washington State Liquor and Cannabis Board's (LCB) tied house regulation, WAC 314-55-018. Raz Yaron, through his company, and two others individuals owned commercial property in Kirkland, Washington. The owners leased the entire property to Jordan River Moving LLC (JRM), and JRM subleased commercial space on the property to a marijuana production business, Dynamic Harvest. Yaron and Sierra S. Conley entered into an agreement wherein Yaron promised to help Conley obtain retail space on the property in exchange for an ownership interest in her retail marijuana business, Sierra S. Conley LLC, d/b/a Mary Jane LLC. In a preenforcement letter, LCB determined that Yaron violated the tied house regulation by having an ownership interest in Mary Jane and leasing to JRM, which in turn leased to Dynamic Harvest. In response, Conley unilaterally eliminated Yaron's ownership interest in Mary Jane. The trial court agreed with LCB that Yaron's interests violated the tied house regulation. And it

concluded that the ownership agreement between Yaron and Conley violated public policy. Therefore, the trial court rescinded the agreement and ordered Conley to pay Yaron restitution as equitable relief.

As an initial matter, LCB's preenforcement letter to Conley did not constitute an agency policy, and the trial court erred in giving it deference. Furthermore, Yaron and his company did not lease directly to Dynamic Harvest, the producer, and thus, the purpose of the regulation and statute—i.e., to prohibit undue influence between two levels of the marijuana industry's distribution chain—is not violated in this case. Specifically, the relationship between Yaron and Dynamic Harvest is too tenuous to conclude that Yaron could improperly influence either Mary Jane or Dynamic Harvest. Finally, the trial court erred when it determined that the agreement between Yaron and Conley violated public policy. And according to the agreement, Conley did not have authority to unilaterally remove Yaron as part owner of Mary Jane. Therefore, we reverse and remand for the matter to proceed to trial.

## FACTS

The material facts are not in dispute.[1] In April 2014, LCB granted Conley, in the name of her business, Mary Jane, a retail marijuana license for operation in Kirkland, Washington.

In 2015, Conley approached the owners of AVH & BJ Holdings LLC with

---

[1] Because Yaron does not challenge any of the court's findings of fact, they are verities on appeal. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) ("[W]here a trial court's findings are unchallenged, they are verities on appeal."). Therefore, we recite the facts according to the trial court's findings.

regard to leasing retail space on their property in Kirkland. Sharon Joseph, Kobi Bracha, and Auroraview Holdings LLC owned AVH & BJ, which owned the property. At the time, Yaron was the majority owner of Auroraview. He also was the personal guarantor and signatory of the $3.4 million commercial loan used to purchase the property, and he and Joseph were the managers of AVH & BJ.

AVH & BJ leased the entire property to JRM, which Joseph owns. AVH & BJ and JRM's lease agreement provides that JRM "shall not assign or encumber the lease without the prior written consent of" AVH & BJ. And under AVH & BJ's operating agreement, its managers had to approve the business's affirmative acts. Accordingly, Yaron and Joseph, as AVH & BJ's managers, needed to approve JRM's subleases. One such sublease was to Dynamic Harvest, a marijuana producer. In accordance with the agreements, Yaron and Joseph provided written consent for JRM to sublease commercial space on the property to Dynamic Harvest.

Joseph, Bracha, and Yaron agreed to obtain commercial space for Conley on the condition that "they became her business partners and were named as part owners of her [LCB] marijuana retail license." "With limited options for commercial marijuana retail space in Kirkland and the possibility of losing her license if she didn't secure such space, Ms. Conley agreed to their terms." Thus, JRM leased the retail property to Mary Jane. In April and May 2015, the parties executed an agreement, "Mary Jane LLC and Store – Agreement." Per the agreement, Yaron and Conley each would have a 33.33 percent interest in Mary Jane, and Joseph and Bracha would share the remaining 33.33 percent interest.

The agreement provided that Mary Jane would "be operated under the [Washington] state rules and regulations" and that "[a]ll items on this agreement are conditional on [LCB] approval." Yaron, Joseph, and Bracha agreed to "bring the cash needed for the business as a loan to the new LLC." Bracha later "abandoned the idea of ownership in Mary Jane," and Conley agreed to give Joseph the full 33.33 percent interest in Mary Jane.

Joseph and Yaron submitted "'Change in Governing Persons'" applications to LCB as required under WAC 314-55.[2] In their applications, Yaron and Joseph did not disclose their various ownership interests in the property. And in September 2015, LCB approved Yaron's application. In its approval letter, LCB requested that Yaron and Conley execute an operating agreement. Among other matters, the one-page operating agreement provided a decision-making policy. Specifically, the operating agreement stated that "[a]ny major expense, business decision, lease related actions, etc. will be done in agreement of all parties." However, it did not define "business decision."

LCB eventually informed Conley that Joseph could not be added to Mary Jane's license. In an e-mail, LCB stated:

> Joseph cannot be added as a true party of interest in your business. After further research it was discovered that Mr. Joseph who owns the property . . . also leases to a producer/processor licensee. If Mr. Joseph became a retail licensee, the licensed entity (Sierra S. Conley LLC) would be in violation of [the tied house regulation and corresponding statute].

It further stated that the Marijuana Enforcement Division was investigating

---

[2] WAC 314-55-120(1) provides that "[l]icensees must receive prior board approval before making [specified] ownership changes."

Yaron's ownership interests in Mary Jane.  And prior to this letter, Conley started to feel as though Yaron was bullying her.  For this reason, she had been corresponding with LCB's employees regarding how to remove an individual from Mary Jane's license and sought prior approval of a new retail location.  She also had informed LCB of Yaron's ownership interest in Auroraview and had met with LCB officers.  However, at no time did she inform Yaron of the investigation or her correspondence with LCB.

On February 2, 2017, LCB sent Conley a letter stating that because of his interest in Auroraview, "Yaron is . . . prohibited from holding any ownership interest in Mary Jane."  The letter asserted that Conley "need[ed] to take immediate steps to remove him from any ownership interest in the business."  It based its conclusion on the LCB licensing supervisor's letter to Mary Jane dated November 2016, which concluded that Joseph's ownership interests in JRM and Mary Jane would violate the tied house regulation.  LCB gave Mary Jane 45 days to remedy Yaron's alleged violation or eliminate Yaron's ownership interests in either Mary Jane or Auroraview.

The February letter was the first instance that Yaron received notice of a potential violation of the tied house regulation or of LCB's investigation into his ownership interests in the property and Mary Jane.  He immediately began divesting from Auroraview after confirming that divestment could cure his violation of the tied house regulation.  But in response to the letter, Conley called a members meeting of Mary Jane for February 12, 2017.  Yaron informed her that he was not available on February 12 but was available on February 14, still

5

within the 45-day stay. Conley proceeded with the meeting on February 12 despite Yaron's unavailability. She and her counsel were the only individuals in attendance. Conley "voted unilaterally to remove Mr. Yaron as a member of Sierra S. Conley LLC."

The next day, February 13, 2017, Yaron sued Conley for breach of contract, breach of fiduciary duty, and declaratory and injunctive relief. In her answer, Conley asserted, as an affirmative defense, that the operating agreement was illegal because it violated public policy.

Prior to trial, LCB sent Yaron a letter stating that (1) prior to his divestment from Auroraview, Yaron "did not qualify to hold a marijuana retail license due to his involvement in an entity that leased property to a marijuana producer/processor licensee" and (2) after his documented divestment from Auroraview, he "would qualify to hold" such a license.

On June 11, 2019, after a bench trial, the trial court found that "Yaron and his business partners leveraged Ms. Conley's need for commercial space in a limited market and under deadline to secure an ownership interest in her marijuana retail license." It gave "great deference to the expertise and opinion of the [LCB] in this matter" but concluded that, because "Yaron was neither a licensed marijuana producer or processor nor a partial owner of [ ] such a business, his ownership interest in" Mary Jane did not violate RCW 69.50.328. However, the court determined that Yaron's "ownership interest in a property leased to a marijuana producer simultaneous to his ownership interest in a marijuana retailer was a regulatory cross-tier violation under WAC 314-55-018

because it created the possibility of undue influence exerted over either entity." The court concluded that this cross-tier violation was "contrary to the public policy of protecting the welfare, health and safety of the public in the arena of drug production, processing and sale." Accordingly, it determined that the operating agreement "violated public policy and was unenforceable." It therefore rescinded the agreement, and it dismissed Yaron's claims with prejudice. But as equitable relief, the trial court awarded Yaron restitution.

Yaron appeals.

## ANALYSIS

### Tied House Regulation Violation

Yaron asserts that the trial court erred when it concluded that his ownership in Mary Jane and AVH & BH violated the State's tied house regulation. We agree.

#### *Deference to LCB's Letter*

As an initial matter, Yaron contends that we do not owe deference to LCB's preenforcement letter and its interpretation of WAC 314-55-018, which concluded that Yaron's interests violated the regulation. Because the letter does not demonstrate that the agency has adopted and applied this interpretation as a matter of agency policy, we agree.

"If an agency is asserting that its interpretation of an ambiguous statute is entitled to great weight it is incumbent on that agency to show that it has adopted and applied such interpretation as a matter of agency policy." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 815, 828 P.2d 549 (1992). The

interpretation does not need to be a "formal adoption equivalent to an agency rule, but it must represent a policy decision by the person or persons responsible." Cowiche Canyon Conservancy, 118 Wn.2d at 815. Nonetheless, an agency's policy statement is "'advisory only'" and does "not have the 'force of law.'" J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 52-53, 156 P.3d 250 (2007) (quoting RCW 34.05.230(1); Joyce v. Dep't of Corr., 155 Wn.2d 306, 323, 119 P.3d 825 (2005)).

Here, as discussed below, the meaning of the regulation is ambiguous. Conley has not shown that LCB's letter represents a policy decision, and we find no reason to conclude that it did. The letter did not interpret the regulation; it simply stated that the regulation prohibited Yaron from having an interest in both Mary Jane and AVH & BJ. LCB did not explain why Yaron's interests violated the regulation or cite a policy that provided as much. Rather, to support its decision that there was a violation, LCB cited and attached its letter to Joseph. However, Joseph's ownership interests were different than Yaron's: Joseph was in direct contractual privity with Dynamic Harvest, as Dynamic Harvest's sublessor.

LCB Senior Enforcement Captain Thomas Dixon's testimony at trial further supports the conclusion that the letter did not represent an agency policy. When asked whether LCB consistently would find, as a matter of agency policy, that interests such as Yaron's interests in Mary Jane and AVH & BJ violate the tied house regulation, Dixon answered, "[I]n this instance, yes." In short, Dixon did not testify that it is an agency policy that ownership interests such as Yaron's

violate the tied house regulation. Accordingly, we do not defer to LCB's determination in its preenforcement letter.

Conley disagrees and cites Haines-Marchel v. Washington State Liquor & Cannabis Board[3] for the proposition that "[s]ubstantial weight is afforded [to] an agency's interpretation of a statute within its expertise and an agency's interpretation of rules that the agency promulgated." However, Haines-Marchel involved the appeal of an adjudicative proceeding under the Washington Administrative Procedure Act, specifically, RCW 34.05.570(3). 1 Wn. App. 2d at 745. And RCW 34.05.570(3) applies to a court's "[r]eview of agency orders in adjudicative proceedings." But LCB's letter is not an agency order based on an adjudicative proceeding. Accordingly, Haines-Marchel is not analogous.[4]

*Applicability of the Regulation*

Yaron contends that the court erred when it concluded that his ownership interests violated the tied house regulation. Because JRM subleased to Dynamic Harvest and because Yaron was not a licensed marijuana producer, Yaron could not unduly influence Dynamic Harvest or Mary Jane and did not violate the tied house regulation.

---

[3] 1 Wn. App. 2d 712, 745, 406 P.3d 1199 (2017).

[4] Conley cites no other persuasive authority. See Dep't of Ecology v. Ballard Elks Lodge No. 827, 84 Wn.2d 551, 554-56, 527 P.2d 1121 (1974) (applying deference to the Shorelines Hearings Board's order following adjudicative proceedings); Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965) (applying deference to the Secretary of the Interior's public land order, which interpreted an executive order); see also Clark v. City of Kent, 136 Wn. App. 668, 675, 150 P.3d 161 (2007) (turning "for guidance on the meaning of the regulation to the agency's interpretation of the regulation," which the agency had set forth in its published *guidelines*).

We interpret regulations, like statutes, de novo. Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 137 Wn. App. 592, 598, 154 P.3d 287 (2007). "When interpreting an administrative regulation, we follow the general rules of statutory construction." Clark v. City of Kent, 136 Wn. App. 668, 672, 150 P.3d 161 (2007). "Under [the] rules of statutory construction, [we] interpret[ ] a WAC provision to ascertain and give effect to its underlying policy and intent." Dep't of Licensing v. Cannon, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). To this end, we interpret administrative rules and regulations "as a whole, giving effect to all the language and harmonizing all provisions." Cannon, 147 Wn.2d at 57. "If the language of the regulation is clear, its plain meaning will reveal the agency's intent." Clark, 136 Wn. App. at 672.

Under RCW 69.50.328, "[n]either a licensed marijuana producer nor a licensed marijuana processor shall have a direct or indirect financial interest in a licensed marijuana retailer." And WAC 314.55.018(1), under its authority provided by the statutory scheme,[5] states, "No industry member or licensee shall enter into any agreement which causes undue influence over another licensee or industry member."

We are asked to determine whether Yaron's ownership interests have the potential to cause undue influence over Mary Jane and/or Dynamic Harvest. It is

---

[5] LCB adopted WAC 314.55.018 pursuant to authority vested in it by RCW 69.50.325, 69.50.342, 69.50.345, and 69.50.369. See RCW 69.50.325 (regulating the distinct licenses for marijuana producers, processors, and retailers); RCW 69.50.342 (providing LCB the authority to adopt rules consistent with the statutory scheme's spirit); RCW 69.50.345 (requiring LCB to adopt rules and regulations for licensing); RCW 69.50.369 (regulating marijuana industry member advertising).

clear from the regulation's language that the primary intent is to prevent improper influence and imbalance in power dynamics within the industry, including throughout the business and supply chain of process, distribution, and sale of marijuana. Specifically, the regulation and the statute prohibit cross-tier financial interests in order to maintain industry members' free agency to source, buy, and supply other industry members. See RCW 69.50.325(1)-(3) (providing for three distinct licenses for each type of marijuana business); RCW 69.50.328 (prohibiting licensed marijuana producers and licensed marijuana processors from having a direct or indirect financial interest in a licensed marijuana retailer); WAC 314-55-018 (prohibiting undue influence between marijuana industries).

However, LCB's regulations do not define "undue influence." Where the statute or regulation provides no definition for a term, we use "its usual and ordinary dictionary definition." Lyft, Inc. v. City of Seattle, 190 Wn.2d 769, 781, 418 P.3d 102 (2018). The dictionary definition of "undue influence" is "such influence over another often presumed from the existence of very close relationships as destroys [their] free agency in the eye of the law."[6] Undue influence could apply to varying degrees of financial relationships. For example, it could apply to any landlord that has an interest in marijuana production, processing, or retail business and rents to a differently tiered marijuana business, even if the rental is not for its marijuana business. On the other side of the spectrum, it could apply to no landlords at all. Thus, the regulation is ambiguous with regard to what constitutes undue influence over another industry member in

---

[6] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2492 (2002).

this situation and generally.  See Cannon, 147 Wn.2d at 56 ("[A]n administrative rule or regulation is unclear [or ambiguous] if it can be reasonably interpreted in more than one way.").  But the statute provides clarity in that it applies specifically to licensed marijuana producers and processors and thereby points to a more narrow interpretation.

Here, Yaron was neither a licensed marijuana producer nor a licensed marijuana processor.  However, Yaron was a manager of AVH & BJ, and under the lease between AVH & BJ and JRM, his prior written consent was required before JRM could sublease any of the property.  AVH & BJ's lease to JRM states, "The Tenant shall not assign or encumber the lease without the prior written consent of the Landlord."  In Dynamic Harvest's lease, it states that "this Sublease and Landlord's consent shall not (a) create privity of contract between Landlord and Subtenant; . . . Landlord's consent shall, however, be deemed evidence of Landlord's agreement that Subtenant may use the Subleased Premises for the purpose set forth in [the Sublease]."  Nothing in AVH & BJ's lease to JRM or in JRM's lease to Dynamic Harvest provides Yaron with control over Dynamic Harvest's business operations or rent.  Rather, Yaron's control of Dynamic Harvest was limited to the approval of its lease from JRM, which he provided by signing the sublease as the landlord.

Yaron's ability to improperly influence Dynamic Harvest ended when he signed JRM's lease to Dynamic Harvest, which he did prior to gaining an ownership interest in Mary Jane.  Yaron's financial interest in Dynamic Harvest is only by way of JRM's payment of the lease, which JRM remains entirely

responsible for, regardless of Dynamic Harvest's financial prosperity. In short, Yaron did not have sufficient authority to influence Dynamic Harvest, and although his interest in Mary Jane subjected him to the statute, because he was not a licensed producer, the combination of his interests did not violate RCW 69.50.328. Thus, Yaron's ability to improperly influence Dynamic Harvest for the benefit of Mary Jane, or vice versa, was too tenuous to result in undue influence, and his interest in Dynamic Harvest did not destroy either companies' free agency, as a matter of law. Yaron's ownership interests did not invoke concerns regarding undue influence between industry members and did not violate the tied house regulation.[7]

Conley disagrees and contends that a producer's landlord cannot have an interest in a retailer without violating the regulation. The trial court agreed and found that LCB "interprets [the] regulation to prohibit a landlord of a marijuana producer/processor from holding an ownership interest in a marijuana retailer because the landlord entity has a financial interest in the success of the producer/processor." But Yaron was not the direct landlord to Dynamic Harvest and did not have a sufficiently indirect or direct financial interest in the producer. Rather, Joseph owned JRM and had a financial interest in Dynamic Harvest. Moreover, beyond the preenforcement letter, Conley points to nowhere in the record or in LCB's interpretations or regulations that supports the court's conclusion that the letter followed agency policy. Accordingly, we are not

---

[7] As an example of an improper financial relationship, JRM's financial interest in Dynamic Harvest is indirect and a violation of the tied house regulation.

13

persuaded.

Conley also asserts that Yaron's ownership interest in the property by itself caused the potential for undue influence over Mary Jane. The court correctly noted that it is difficult to secure a legally sufficient property, which limits Mary Jane's ability to negotiate and, thus, its ability to resist improper influences, like those from Yaron seeking an ownership interest in the retail business. However, it was only Yaron's status as a landlord in an area that can be leased to a marijuana business that caused undue influence over Mary Jane, not his status as a landlord *of a producer*. Thus, this interest does not create undue influence as imagined or designed to be prevented by the regulation and statute.

### Violation of Public Policy

Yaron asserts that the court erred in concluding that the operating agreement violated public policy and in rescinding it. Because the operating agreement did not involve or condone cross-tier financial interests in the marijuana industry, the operating agreement did not violate public policy, and the court erred in rescinding it.

Whether a contract violates public policy is a question of law that we review de novo. Dix v. ICT Grp., Inc., 160 Wn.2d 826, 833-34, 161 P.3d 1016 (2007). "As a matter of law, '[c]ontract terms are unenforceable on grounds of public policy when the interest in [their] enforcement is clearly outweighed by a public policy against the enforcement of such terms.'" LK Operating, LLC v. Collection Grp., LLC, 181 Wn.2d 48, 85, 331 P.3d 1147 (2014) (first alteration in original) (quoting State v. Noah, 103 Wn. App. 29, 50, 9 P.3d 858 (2000)).

14

Contracts "are not to be held void as being contrary to public policy unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy or they manifestly tend to injure the public in some way." Motor Contract Co. v. Van Der Volgen, 162 Wash. 449, 454, 298 P. 705 (1931). And

> whether something can be a source of public policy in the context of contract enforceability should depend on whether it is primarily intended to promote the public good or protect the public from injury, and whether it was issued by an entity with the legal power and authority to set public policy in the relevant context.

LK Operating, LLC, 181 Wn.2d at 86. We determine whether a contract violates public policy by looking at all of the circumstances surrounding the case. Van Der Volgen, 162 Wash. at 454.

Here, the tied house regulation and its prohibition of undue influence by cross-tier interests provide a basis for public policy and promotes the public good. Specifically, the tied house regulation, which provides that LCB will suspend or cancel licenses when violations exist, fulfills LCB's purpose to promote public health, safety, and welfare in the context of marijuana regulations. See, e.g., WAC 314-55-050(17) (asserting that LCB acts to deny, suspend, or cancel marijuana licenses when it is in the "best interest of the welfare, health, or safety of the people of the state"). In short, the regulation is meant to protect individuals within the industry from undue influence and consumers from price gouging and other concerns.

In addition, the regulation was issued by LCB in an area in which it has authority to set public policy. That is, the legislature granted LCB the legal authority to create and enforce cannabis regulations "not inconsistent with the

15

spirit" of the recreational marijuana law and "necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and takes effect immediately." RCW 69.50.342(1); LAWS OF 2020, ch. 133, § 5. Because the regulation promotes the public good and because LCB created the regulation in the context of marijuana industry regulations, the regulation can be a source of public policy and can prohibit enforcement of contracts contrary thereto.

However, the public policy that results from the regulation is not affronted by the operating agreement. The operating agreement stated that Conley would have a 66.67 percent interest, that Yaron would have a 33.33 percent interest in Mary Jane, and that Yaron would supply the business with $40,000. It further provided Mary Jane's procedures for decision-making and for distributions. The one-page operating agreement had no provisions offensive to the purpose of public health, safety, or welfare, and it did not invoke concerns of cross-tier financial influence or undue influence. Therefore, the trial court erred when it concluded that the operating agreement violated public policy. And because the operating agreement did not violate public policy, we reverse the trial court's order rescinding the contract.

The trial court and Conley focused on the problematic creation of the operating agreement, which arose out of a power disparity between Yaron and Conley due to Conley's inability to find satisfactory rental space. To this end, Conley cites LK Operating, LLC, where an attorney, Leslie Powers, and another individual, Brian Fair, allegedly entered into an agreement regarding a joint debt

collection venture, The Collection Group LLC (TCG). 181 Wn.2d at 59. At the time, Powers and their law firm provided free legal services for TCG, and Power's company, LK Operating (LKO), sent checks to TCG for the purpose of purchasing debt portfolios. LK Operating, LLC, 181 Wn.2d at 59-61. Fair asserted that any agreement was void because Powers did not comply with the Rules of Professional Conduct (RPC), which "restricts an attorney's ability to enter business transactions with current clients." LK Operating, LLC, 181 Wn.2d at 62. Powers argued that he did not enter into an agreement with TCG but that LKO was the partner to the agreement. LK Operating, LLC, 181 Wn.2d at 62. He, therefore, asserted that the agreement did not violate the RPCs and did not violate public policy. LK Operating, LLC, 181 Wn.2d at 62.

The court disagreed and concluded that, given "the entire set of arrangements contemplated by the joint venture proposal," Powers was a party to the agreement and entered the agreement as an attorney, implicating the RPC. LK Operating, LLC, 181 Wn.2d at 74-75, 80. The court held "that the business transaction contemplated by the joint venture proposal is unenforceable on public policy grounds" because it violated the RPCs. LK Operating, LLC, 181 Wn.2d at 85-86. It affirmed the trial court's rescission of the agreement between LKO and TCG. LK Operating, LLC, 181 Wn.2d at 85.

Unlike LK Operating, LLC, here, the circumstances surrounding the agreement, including the agreement itself, the transaction, and Yaron's ownership interests, did not violate LCB's regulations, public policy, or affront the public good. While LK Operating, LLC involved a clear violation of the RPCs,

Yaron's ownership interests did not clearly violate the tied house regulation. And the regulation is not concerned with a landlord's decision to rent to an industry member, like Mary Jane, in isolation. Rather, the regulation prohibits agreements, including rental agreements, which could result in undue influence. But the operating agreement here could not result in undue influence within the marijuana industry, and it did not contravene public policy.

We reverse and remand for the matter to proceed to trial.

_____

WE CONCUR:

_____          _____